RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0228p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellee*,

*v.*

No. 13-4169

E.M.A. NATIONWIDE, INC., NEW LIFE FINANCIAL
SOLUTIONS, INC.; 1 UC INC.; 7242701 CANADA INC.;
7242697 CANADA INC.; 7246293 CANADA INC.;
7246421 CANADA INC.; JAMES BENHAIM; DANIEL
MICHAELS,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland
No. 1:12-cv-02394—James S. Gwin, District Judge.

Argued: June 20, 2014

Decided and Filed: September 8, 2014

Before: SILER, CLAY and GIBBONS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Jennifer A. Lesny Fleming, KAUFMAN & COMPANY, LLC, Cleveland, Ohio, for
Appellants. David L. Sieradzki, FEDERAL TRADE COMMISSION, Washington, D.C., for
Appellee. **ON BRIEF:** Jennifer A. Lesny Fleming, Steven S. Kaufman, KAUFMAN &
COMPANY, LLC, Cleveland, Ohio, for Appellants. David L. Sieradzki, John F. Daly,
FEDERAL TRADE COMMISSION, Washington, D.C., for Appellee.

1

---

**OPINION**

---

CLAY, Circuit Judge.  The Federal Trade Commission ("FTC") filed a complaint against Defendants E.M.A. Nationwide, Inc. ("E.M.A."), 1 UC Inc. ("First United"), New Life Financial Solutions, Inc. ("New Life"), four Canadian corporations,[1] Daniel Michaels, James Benhaim, Phillip Hee Min Kwon, Joseph Shamolian, and Nissim N. Ohayon,[2] alleging violations of § 5(a) the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a); the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310; and the Mortgage Assistance Relief Services Rule ("MARS Rule"), 12 C.F.R. Part 1015.  After the district court denied various motions filed by Defendants, including motions to stay proceedings and a motion for further discovery, the FTC filed a motion for summary judgment.  Defendants failed to file a brief in opposition to the motion, and the district court granted summary judgment in favor of the FTC.  Defendants appealed the district court's denials of the motions to stay proceedings and for further discovery as well as the district court's grant of summary judgment.

For the reasons set forth below, this Court **AFFIRMS** the district court's orders and entry of summary judgment.

**I.**

**BACKGROUND**

**A.     Procedural History**

On September 25, 2012, the FTC filed a complaint alleging that Defendants fraudulently marketed and sold debt-related services, failed to provide those services, and retained money as upfront fees in violation of the FTC Act, the TSR, and the MARS Rule.  The FTC also filed a motion for a temporary restraining order ("TRO") and a preliminary injunction, and provided

---

[1]Each of the Canadian corporations is identified by a corporate number: (1) 7242701 Canada Inc.; (2) 7242697 Canada Inc.; (3) 7246293 Canada Inc.; and (4) 7246421 Canada Inc.

[2]Kwon, Shamolian, and Ohayon are no longer parties in this case.

over 1,000 pages of exhibits, including declarations from Defendants' former customers, copies of their contracts, other documents provided by customers, and Defendants' bank records.

On October 10, 2012, Defendants filed a motion to stay proceedings, asserting that a stay was necessary because a criminal investigation had been launched into their business activities, as evidenced by a raid conducted by the Royal Canadian Mounted Police ("RCMP"). According to Defendants, the RCMP, at the direction of the United States Department of Justice ("DOJ") and the United States Postal Service ("USPS"), raided Defendants' Montreal office and Michaels' Montreal residence, seizing all of their business and personal records—records they claim were necessary to defend against the FTC's allegations. Despite these assertions, the district court denied Defendants' motion on October 11, 2012.

The following day, the district court held a preliminary injunction hearing. At the hearing, Michaels' attorney reminded the court that most of the relevant evidence was in the possession of the Canadian authorities and that the DOJ had "indicated . . . indictments would be filed in the Southern District of Florida." (R. 78, 10/12/2012 Tr. of Hr'g at 1936–37.)[3] On October 25, 2012, the FTC and Defendants entered into a stipulated preliminary injunction, enjoining Defendants from operating their businesses.

On June 4, 2013, less than a month before the preliminary discovery deadline, Defendants filed a renewed motion for a stay of proceedings and a memorandum in support of the motion, claiming a stay was necessary to protect Michaels' constitutional rights and to allow Defendants to defend themselves in the instant action. Defendants reasserted that they were unable to access critical records gathered by the DOJ because the investigation was still ongoing. In opposition to the motion, the FTC asserted that although Defendants were then subject to preliminary injunctions preventing them from operating their businesses and continuing to deceive consumers, a stay would be inappropriate. Additionally, the FTC claimed that Defendants had frequently and freely invoked their Fifth Amendment right to remain silent throughout discovery, even in the absence of any formal indictments. Therefore, the FTC

---

[3]Citations to the record are accompanied by references to Page ID numbers.

claimed, Defendants' constitutional rights would not be violated if the stay were denied.[4] Without explanation, the district court denied the motion on June 12, 2013.

On July 8, 2013, the FTC filed its motion for summary judgment and attached over 1,000 pages of exhibits. Sixteen days later, on July 24, 2013, Defendants filed a motion for extension of the deadline for filing the response, claiming they were entitled to an extension because they were unable to open the FTC's responses to Defendants' first requests for production, which they had received the day before. The district court denied this motion on July 29, 2013 without analysis or explanation.

Defendants filed a motion to continue the FTC's summary judgment motion to allow for further discovery pursuant to Federal Rule of Civil Procedure 56(d), claiming that only if they were afforded access to their own documents and materials could they properly defend against the summary judgment motion. Defendants also asserted that genuine issues of material fact existed as to the FTC's claims. Without analysis or explanation, the district court also denied this motion. Defendants then failed to respond in opposition to the motion for summary judgment.

Ultimately, the district court granted the FTC's motion for summary judgment on August 26, 2013. The court found that Defendants violated the FTC Act, the TSR, and the MARS Rule, that they acted as a common enterprise and therefore could be held jointly and severally liable for their acts, and that Benhaim and Michaels were personally liable for injunctive and monetary relief for the corporations' acts. The district court ordered Defendants to jointly pay restitution in the amount of $5,706,135.48 to the consumers who were injured by Defendants' practices. Additionally, the court permanently enjoined Defendants from working in "the debt relief and mortgage assistance industries." *F.T.C. v. E.M.A. Nationwide, Inc., et al.*, No. 1:12–cv–2394, 2013 WL 4545143, at *8 (N.D. Ohio Aug. 27, 2013).

---

[4]While the motion was pending before the district court, Defendants filed a notice of discovery dispute to alert the court that the FTC had failed to produce requested discovery, had not properly disclosed relevant discovery it possessed, and had sent a letter to Defendants refusing to produce some of the discovery, in apparent violation of an earlier court order. This dispute was resolved on June 7, 2013, when the FTC agreed to supplement its Rule 26 disclosures and to produce various documents and data. Subsequently, on June 17, 2013, Defendants received discovery from the FTC, but found that it did not include all relevant materials in the FTC's possession. On June 18, 2013, Defendants served the FTC with their first formal request for production, seeking access to the documents seized by the Canadian government to which Defendants believed the FTC had access.

Defendants filed a timely notice of appeal, asserting that the district court abused its discretion in denying their renewed motion for a stay of proceedings and their motion for additional discovery, and that the court erred in granting the FTC's motion for summary judgment.

## B.       Factual Background

In 2010, Michaels and Benhaim allegedly constructed a telemarketing operation through which they employed telemarketers to place cold calls to individuals across the United States who were burdened by mortgage, credit card, and student loan debts. It is alleged that in order to achieve this goal and to execute this plan without detection, Michaels and Benhaim created a series of American and Canadian corporations.

### 1.       Maze of Interrelated Corporations and Individuals

The first American corporation in this series was E.M.A., which was initially registered to Ohayon and incorporated by attorney Kwon, and then formally transferred to Michaels, who was listed as the new registered agent in the 2012 For Profit Corporation Annual Report. Numerous documents in the record link Michaels and Benhaim to E.M.A. These include emails sent by Benhaim as President of E.M.A. on which Michaels was copied, and documents laying out the relationship between E.M.A. and a third party payment processor listing Michaels as Vice President of Sales and including his email address as president@emaonline.net.

Late in 2010, Defendants appeared to have abandoned their first corporation and moved on to develop New Life. They used similar means for creating New Life and similar individuals controlled the corporation. For example, New Life's 2012 For Profit Corporation Annual Report also listed Michaels as the newly registered agent. In a series of emails with another third party payment processor, Benhaim identified Michaels as affiliated with New Life. In one particular email, Benhaim signed as president of E.M.A., yet the email's subject line referred to New Life.

Once again, in 2012, Defendants transitioned to another new company, from New Life to First United. An email sent from Benhaim to its third-party payment processor described the transition:

> As we discussed a few weeks ago, New Life Financial will be changing its company name and upgrading its process. That time has come, we have the new company incorporated as 1UC Inc. and will be changing our name to 1st United Consultants . . . . We will be opening a new bank account today and will provide that information as soon as possible. We will have New Life running simultaneously to close out the existing files.

(R. 5-2, Mot. for TRO Ex. Vol. I, at 195.)

Throughout this time, four Canadian corporations operated in tandem with the American companies. Many of the Canadian corporations used the same business address, commingled funds to pay each other's employees and expenses, and frequently transferred funds from one to another. Additionally, each of the Canadian corporations listed either Benhaim or Michaels as president. The amount of evidence in the record demonstrating the overlapping nature of the Canadian and American corporations is overwhelming. Each of the corporations had many common employees and administrators, the same individuals purchased email accounts and web URLs for each of the three American corporations, the American corporations used the same phone numbers at various points in time, and they used similar contracts and other documents when interacting with customers. Additionally, American and Canadian bank records show numerous wire transfers between the American and Canadian corporations, and that one of the Canadian corporations paid a First United employee. According to Canadian bank records, either Michaels, or Benhaim, or both controlled the Canadian corporations' accounts.

### 2.      The Common Scheme

For the most part, each of the American corporations operated in the same manner. They conducted cold calls to target struggling American consumers and made promises to consumers that the record establishes were rarely, if ever, kept.

Defendants' telemarketers followed written scripts when interacting with consumers. Although the record contains only written scripts from E.M.A. and First United, the declarations from numerous consumers defrauded by Defendants demonstrate that E.M.A., New Life, and First United operated in a similar manner. The telemarketers generally began their calls by congratulating consumers for qualifying for a special expense reduction program or asking whether the consumer was interested in decreasing his or her debts. Telemarketers generally

stated that they were affiliated with the consumer's creditors or lenders, were calling on behalf of the government,[5] or had special relationships with creditors or lenders that enabled them to negotiate debt management deals that were unobtainable by other service providers. (R. 157-3, Mot. for Summ. J. Ex. Vol. II, at 3039 ("The reason for my call today . . . is because your file has been placed on my desk for review this morning. It actually came up for review from your current lender and creditors with our wholesale department regarding your property . . . .").) None of the scripts or consumer declarations provide evidence that Defendants included a disclosure that they were not, in fact, associated with the government or with consumers' lenders or creditors.

As these telephone conversations continued, the telemarketers made various claims that they could negotiate with consumers' lenders and credit card companies to reduce monthly payments, interest rates, and/or outstanding principal balances by as much as 50 to 70 percent. According to the scripts and declarations in the record, Defendants' telemarketers explained that they only charged nominal fees for their services and consumers could cancel at any time. Numerous consumers' declarations assert that they were instructed by Defendants' representatives to stop paying their creditors or lenders and to allow Defendants to pay on their behalf. For example, one consumer stated in his declaration that New Life's representative "instructed [him] to stop paying [his] mortgage and credit cards . . . . He instructed [him] not to deal with [his] mortgage lender and the credit card companies if they called . . . about the missed payments." (R. 5-4, Mot. for TRO Ex. Vol. III, at 769.) Additionally, Defendants' own Debt Appraisal Guide warned consumers as follows: "If you are in the process of dealing with collectors, you must always remember: DO NOT SPEAK TO YOUR CREDITORS UNTIL YOU HAVE MAPPED OUT A CLEAR SOLUTION TO THE PROBLEM!" (R. 5-3, Mot. for

---

[5]One script used by E.M.A. said, "I am calling on behalf of your creditors and the Obama Debt Relief Initiative and I have some GREAT NEWS for you!!! My job today is to give you information on how to cut your debt by 50% OR MORE!!!!" (R. 5-2, Mot. for TRO Ex. Vol. I, at 255.) A consumer declaration states, "Kane [at New Life] told me New Life helped homeowners lower their mortgage rates and monthly payments by modifying their mortgage loans through a program initiated by President Obama called the Home Affordable Modification Program, or HAMP." (R. 5-3, Mot. for TRO Ex. Vol. II, at 536.) Another consumer stated that he received a call from a First United representative claiming that he "qualified for a new program that President Obama signed a week earlier. He told me that my mortgage payment would be lowered." (R. 5-4, Mot. for TRO Ex. Vol. III, at 826.)

TRO Ex. Vol. II, at 382.)[6]   First United's own "Objections, Rebuttals & FAQ" includes a scripted response to the question "Why should I stop paying my creditors?" (R. 157-3, Mot. for Summ. J. Ex. Vol. II, at 3055.)  This response states, among other things, "When creditors do not receive payments, this impacts their bottom line and in so doing you effectively take back control and force the creditors to negotiate with you!" (*Id*.)  Defendants' program was allegedly designed such that consumers would pay monthly amounts to Defendants, who represented during the initial calls that they would make payments on behalf of consumers and retain only a small fee for their services.

Once the initial conversations ended, Defendants sent lengthy contracts and debt management guides to each of their new clients.  These documents more accurately presented the services provided by Defendants.  For example, one excerpt of the New Life contract reads as follows:

> 1.5  This is an Agreement for your participation in the Program, in which [New Life] will provide financial consultation and referral services . . . . [New Life] does not assume your debts.  [New Life] agrees to provide its best efforts to produce a clear picture of your financial situation . . . .

(R. 5-2, Mot. for TRO Ex. Vol. I, at 322.)  The contract also stated,

> 1.9  [New Life] advises, counsels, and tries to assist you in placing your debts with a 3rd Party service . . . . [New Life] will provide financial consultation and referral services . . . and refer you to the appropriate companies . . . . [New Life] is a fully independent service provider and is not affiliated in any way with the 3rd parties and is not responsible for their performance . . . .

(*Id*.)  On the top of the twenty-sixth page of New Life and First United's debt appraisal guides, a disclaimer appeared in a box stating, "Important Disclaimer: . . . NEW LIFE FINANCIAL simply provides information on how to go about managing your finances and your debt." (R. 5-3, Mot. for TRO Ex. Vol. II, at 386.)  And buried in the middle of these guides, which were approximately sixty pages long, were statements that clients must continue to pay their creditors and lenders, otherwise they risked negatively impacting their credit.

---

[6]Further down on that same page, in smaller font, the guide states that "NOT MAKING PAYMENTS ON YOUR DEBTS WILL HAVE A NEGATIVE IMPACT ON YOUR CREDIT.  NEW LIFE FINANCIAL DOES NOT ADVISE ITS CLIENTS TO NOT PAY THEIR BILLS OR HONOR THEIR COMMITMENTS." (R. 5-3, Mot. for TRO Ex. Vol. II, at 382.)

Despite the representations and disclaimers made in the written documents, consumers paid Defendants, expecting Defendants to then make payments on their debts and see those debts decrease dramatically. Consumers often made several monthly payments totaling thousands of dollars based on these expectations. Defendants generally failed to notify consumers that their contracts were referred to third parties, and many of these third parties attempted to charge additional fees in the thousands of dollars on top of the fees already paid by consumers to obtain Defendants' "services." Once consumers realized they had been duped by Defendants, they often attempted to cancel their services and demand refunds of the thousands of dollars they had already paid Defendants. Many of their declarations document the difficulties they faced in obtaining refunds of their payments.

### 3.    Do Not Call Registry Violations

A declaration from FTC investigator Mary Jo Vantusko explains that Defendants never subscribed to the national Do Not Call Registry and did not pay the necessary fees to obtain consumer telephone numbers from the Registry. Without subscribing, Defendants could not have known which of their calls were made to individuals in the Registry. Numerous declarations establish that Defendants' telemarketers conducted cold calls to consumers listed on the Registry, who did not have prior business relationships with Defendants. *See* 16 C.F.R. § 310.4(b)(1)(iii)(B).

### 4.    Investigations

The FTC began an investigation into Defendants' activities in 2011. They were assisted in their efforts by Canadian and United States agencies, including the RCMP, Quebec provincial authorities, the USPS, and the DOJ. These investigations led the FTC to file a complaint in the instant case on September 25, 2012.

**II.**

**DISCUSSION**

**A.        Defendants' Motion for Further Discovery**

**1.        Standard of Review**

Federal Rule of Civil Procedure 56(d) states, "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court *may*: (1) defer considering the motion or deny it; (2) allow time . . . to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d) (emphasis added). Due to this discretionary language, appellate courts "review a district court's decision as to the scope of discovery, including the denial of additional time for discovery, under an abuse of discretion standard." *Jordan v. City of Detroit*, No. 12–2296, 557 F. App'x 450, 455 (6th Cir. Feb. 21, 2014). *See also Audi AG v. D'Amato*, 469 F.3d 534, 541 (6th Cir. 2006). "An abuse of discretion occurs when the reviewing court is left with the definite and firm conviction that the trial court committed a clear error of judgment." *United States v. Hunt*, 521 F.3d 636, 648 (6th Cir. 2008) (internal quotation marks omitted). Therefore, this Court may only reverse the district court's conclusion as to Defendants' motion if it finds that the ruling was arbitrary, unjustifiable, or clearly unreasonable.

**2.        Analysis**

"A party invoking [the] protections [of Rule 56(d)] must do so in good faith by affirmatively demonstrating . . . how postponement of a ruling on the motion will enable him . . . to rebut the movant's showing of the absence of a genuine issue of fact." *Willmar Poultry Co. v. Morton-Norwich Prods., Inc.*, 520 F.2d 289, 297 (6th Cir. 1975). This Court examines a number of factors when determining whether the district court abused its discretion in failing to grant a motion for further discovery:

> (1) [W]hen the appellant learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would have changed the ruling below; (3) how long the discovery period had lasted; (4) whether the appellant was dilatory in its discovery efforts; and (5) whether the appellee was responsive to discovery requests.

*Plott v. Gen. Motors Corp., Packard Elec. Div.*, 71 F.3d 1190, 1196–97 (6th Cir. 1995) (internal citations omitted); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008). This Court's main inquiry is "whether the moving party was diligent in pursuing discovery." *Dowling v. Cleveland Clinic Found.*, 593 F.3d 472, 478 (6th Cir. 2010).[7]

In the instant case, Defendants' attorney filed a declaration with their motion, asserting that Defendants were diligent in their pursuit of discovery and that the *Plott* factors weighed in their favor. However, when determining whether the district court abused its discretion, this Court may only reverse upon a finding that the ruling was arbitrary, unjustifiable, or clearly unreasonable. In the instant case, there is sufficient evidence that the *Plott* factors were not applied in a clearly unreasonable, arbitrary, or unjustifiable manner.

First, Defendants knew of the issues that were the subjects of the desired discovery early on in the proceedings, and they were aware that they no longer had access to their records two days after the complaint was filed against them.

Second, it does not appear that the desired discovery would have changed the final outcome below.[8] Although Defendants are correct that the thousands of pages of exhibits submitted by the FTC were cherry-picked to present the best evidence against Defendants, it is

---

[7]According to the D.C. Circuit, "A . . . motion requesting time for additional discovery should be granted 'almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence.'" *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012) (quoting *Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.C. Cir. 1995)). Similarly, the First Circuit has stated that

> [c]onsistent with the salutary purposes underlying Rule 56(f), district courts should construe motions that invoke the rule generously, holding parties to the rule's spirit rather than its letter . . . . This does not mean, however, that Rule 56(f) has no bite or that its prophylaxis extends to litigants who act lackadaisically; use of the rule not only requires meeting several benchmarks, but also requires due diligence both in pursuing discovery before the summary judgment initiative surfaces and in pursuing an extension of time thereafter. In other words, Rule 56(f) is designed to minister to the vigilant, not to those who slumber upon perceptible rights.

*Resolution Trust Corp. v. N. Bridge Assocs.*, 22 F.3d 1198, 1203 (1st Cir. 1994) (citation omitted). (Rule 56(f) is now designated as Rule 56(d).)

[8]Defendants assert that they needed access to their computer files to establish that they purchased "scrubbed lists" of leads that were in compliance with the MARS Rule. This is the one piece of evidence requested by Defendants that conceivably could have altered the outcome below in some small way.

not clear how additional evidence would have established a dispute of material fact on any of the issues in this case.

Defendants claim that access to more consumer contracts would show that the actual written representations made to consumers directly contradict and actually correct Defendants' verbal communications. However, the record already contains numerous contracts between consumers and each of the three American corporate defendants. Adding more contracts to the record would not have led to a different outcome.

Defendants also claim that bank records, bank statements, and other corporate records would have established the corporate hierarchy to prove that Benhaim and Michaels neither controlled nor knew of the unlawful business practices of the corporations. However, hundreds of pages of evidence already in the record, including official bank records and receipts, list Benhaim and Michaels in various leadership positions with each of the corporations. Emails and formal corporate documents already in the record establish that Benhaim and Michaels served as and represented that they were either president or vice president of each of the corporate entities, including the Canadian corporations.

Finally, Defendants assert that they should have been given the opportunity to access documents showing that they changed their business models to comply with the newly-changed laws. The record, however, contains sufficient evidence of each corporation's activities during the period of time from 2010 through 2012. It is difficult to see how most of the requested evidence would have changed the outcome below.

The third *Plott* factor does not weigh in either party's favor. Although the discovery period was abbreviated, it lasted for nearly five months, which was a sufficient amount of time for Defendants to conduct *some* discovery.

The fourth *Plott* factor does not weigh strongly in either party's favor. Although Defendants repeatedly notified the district court that they could not obtain their records and attempted some means of discovery, they did not file a formal discovery request until June 18, 2013, and they did not pursue other meaningful forms of discovery.

Early on in the proceedings, Defendants hired Canadian counsel to seek return of Defendants' property from the Canadian authorities. In fact, Defendants notified the court that on or about May 20, 2013, the Canadian authorities agreed to return their documents. However, as of the filing of their motion, Defendants had not yet received those records.

During hearings and conferences, Defendants repeatedly reminded the district court and the magistrate judge that they continued to lack access to their own records. Defendants issued subpoenas on January 3, 2013, directing the DOJ to produce documents and information within 30 days of service. However, as the DOJ's letter in response to that request indicates, the subpoenas were invalid because they failed to comply with DOJ regulations and civil procedure rules, and even had they been valid, DOJ's regulations barred production of the documents. Defendants did not attempt to follow up on that letter, challenge its legal assertions, or narrow their requests. They filed a notice of discovery dispute with the court on June 5, 2013, alleging that the FTC and the DOJ were not cooperating with their requests for assistance in obtaining files from the RCMP.

Defendants failed to attempt other methods for obtaining their desired materials. For example, although the RCMP eventually turned over their files, it is possible that they could have obtained them earlier by following procedures pursuant to Canada Criminal Code § 490.[9] Additionally, rather than submitting complaint after complaint that the DOJ failed to comply with their requests for documents, Defendants could have used other methods to obtain many of those documents, including serving proper subpoenas on banks, payment processors, or other entities, taking depositions of the consumers whose declarations already appeared in the record, or serving interrogatories on co-Defendants who were no longer parties in the case.

Although there is some evidence in the record that Defendants pursued their materials in a diligent manner, they failed to file a formal request for production until one month before the relevant discovery deadline. They only filed the instant motion for additional discovery on July 25, 2013, more than three weeks after the July 1, 2013 deadline for completing discovery needed

---

[9]This process may not be as useful as the FTC asserts because it appears that there is an exception for records in an ongoing investigation.

to support or defend dispositive motions and days after the July 22, 2013 deadline for filing opposition to the motion for summary judgment.

Finally, the fifth *Plott* factor does not weigh in either party's favor. Defendants claim that the FTC was dilatory in responding to Defendant's first discovery request. This "request" was an email entitled "Discovery request" sent from Defendants' counsel to the FTC on May 9, 2013. The entire email requests as follows: (1) "Please send us *all* of the discovery that you have not turned over"; (2) "Please send us your intended witness list"; and (3) "Please inform us the results of your ordered discussion with the Department of Justice regarding discovery in this case." (R. 163-1, 7/24/2013 Email, at 4104.) The first of these requests was improper because it did not follow required procedure and did not describe with particularity the items sought. *See* Fed. R. Civ. P. 34. Although the FTC objected to the "request" on those grounds and others, the FTC offered to voluntarily produce documents it received in response to civil investigative demands and subpoenas issued since the complaint was filed. The second request for the FTC's intended witness list was also improper because the parties were not required to file witness lists until three days prior to the final pre-trial conference scheduled for September 17, 2013. The third request was for the FTC to provide information about a discussion with the DOJ regarding discovery in their case. The FTC responded in a letter that they were never ordered to discuss discovery with the DOJ, yet "[they would] inform [Defendants] of the results of [their] discussion when there [was] something to report." (R. 163-2, 5/13/2013 Email, at 4108.)

Defendants filed a notice of discovery dispute regarding the above-referenced request, and that dispute was resolved through a June 7, 2013 minute order requiring the FTC to produce supplemental disclosures and particular documents. The FTC produced those documents on June 17, 2013, but Defendants found that they had not received all relevant materials in the FTC's possession. On June 18, 2013, Defendants served the FTC with their first formal request for production, seeking access to the documents seized by the Canadian government. The FTC turned those documents over in encrypted form just days before the deadline for filing an opposition to the motion for summary judgment. Although the FTC appears to have taken its time in remitting those documents, it was within its right to do so because it complied with court

deadlines for responding to production requests.  Therefore, the fifth *Plott* factor does not weigh strongly in either party's favor.

Defendants assert that "there was absolutely no reason that the District Court could not have granted E.M.A. Defendants the additional time they requested in their Rule 56(d) Motion . . . because E.M.A. Defendants' business practices were already 'enjoined . . .' and their businesses had been 'completely shuttered.'"  Defs.' R. Br. at 15.  This is true.  However, Defendants had wrongly taken millions of dollars from American consumers who continued to face financial struggles caused by their interactions with Defendants.  As a result, further delay of the proceedings and the ultimate restitution award could have caused great prejudice to consumers.  Although Defendants may have belatedly expended some efforts in their pursuit of discovery, and discovery might have provided some minimal evidence to counter the FTC's claims, the district court did not abuse its discretion in denying Defendants' Rule 56(d) motion.

## B.    Defendants' Motion to Stay Proceedings

### 1.    Standard of Review

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes in its docket with economy of time and effort for itself, for counsel and for litigants, and the entry of such an order ordinarily rests with the sound discretion of the District Court."  *Ohio Envtl. Council v. U.S. Dist. Court, S. Dist. of Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir. 1977) (citation and internal quotation marks omitted).  *See also Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("[T]he District Court has broad discretion to stay proceedings as an incident to its power to control its own docket.").  As a result, this Court reviews a district court's decision denying a party's motion to stay trial proceedings for abuse of discretion.  *See Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012). This is a highly deferential standard, *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 267 (6th Cir. 2001), especially because "[a] stay of civil proceedings due to a pending criminal investigation is an extraordinary remedy," *United States v. Ogbazion*, No. 3:12–cv–95, 2012 WL 4364306, at \*1 (S.D. Ohio Sept. 24, 2012) (internal quotation marks omitted).  "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or

makes a clear error of judgment." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012). *See also Plain Dealer Publ'g Co. v. City of Lakewood*, 794 F.2d 1139, 1148 (6th Cir. 1986) ("Under the abuse of discretion standard, an appellate court may overturn a lower court's ruling only if it finds that the ruling was arbitrary, unjustifiable or clearly unreasonable.").

### 2.    Analysis

It is clear that "nothing in the Constitution requires a civil action to be stayed in the face of a pending or impending criminal indictment," *Chao v. Fleming*, 498 F. Supp. 2d 1034, 1037 (W.D. Mich. 2007), and "there is no requirement that a civil proceeding be stayed pending the outcome of criminal proceedings," *S.E.C. v. Novaferon Labs, Inc.*, No. 91-3102, 941 F.2d 1210, at *2 (6th Cir. Aug. 14, 1991).[10]    As a result, district courts have "broad discretion in determining whether to stay a civil action while a criminal action is pending or impending." *Chao*, 498 F. Supp. 2d at 1037.

District courts generally consider and balance certain factors when determining whether a stay of civil proceedings is appropriate in a given case:

> 1) the extent to which the issues in the criminal case overlap with those presented in the civil case; 2) the status of the case, including whether the defendants have been indicted; 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; 4) the private interests of and burden on the defendants; 5) the interests of the courts; and 6) the public interest.

*Id*. (internal quotation marks omitted).    In addition to those factors, district courts "should consider 'the extent to which the defendant's fifth amendment rights are implicated.'" *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 324 (9th Cir. 1995) (quoting *Fed. Sav. & Loan Ins. Corp. v. Molinaro*, 889 F.2d 899, 902 (9th Cir. 1989)).    "[T]he burden is on the party seeking the stay to show that there is pressing need for delay, and that neither the other party nor the public will suffer harm from entry of the order." *Ohio Envtl. Council*, 565 F.2d at 396.    The most important factor is the balance of the hardships, but "[t]he district court must also consider

---

[10]*See also S.E.C. v. Dresser Indus., Inc.*, 628 F.2d 1368, 1374 (D.C. Cir. 1980) ("The civil and regulatory laws of the United States frequently overlap with the criminal laws, creating the possibility of parallel civil and criminal proceedings, either successive or simultaneous.    In the absence of substantial prejudice to the rights of the parties involved, such parallel proceedings are unobjectionable under our jurisprudence.").

whether granting the stay will further the interest in economical use of judicial time and resources." *Int'l Bhd. of Elec. Workers v. AT&T Network Sys.*, No. 88–3895, 879 F.2d 864, at *8 (6th Cir. Jul. 17, 1989) (internal citations omitted).

> In the instant case, Defendants assert that the renewed motion to stay

> made clear that: (1) a criminal indictment was imminent and a stay was necessary to protect Mr. Michaels' Constitutional rights; (2) granting a stay would promote the interests of the court in judicial economy and preventing discovery abuses; (3) a stay would not cause any harm to the public interest as EMA Defendants were enjoined from—and did not intend to—pursue their respective businesses, and the imminent criminal prosecution would serve to further the public interest; and (4) a stay was crucial in this case because EMA Defendants *still* had no access to the vital discovery necessary to defend against the FTC's claims.

Defs.' Br. at 41. Basically, Defendants' argument regarding the motion to stay is twofold: (1) a stay would have saved the district court from having to deal with issues likely to arise in the event that criminal and civil proceedings went forward simultaneously; and (2) a stay would have protected Defendants from discovery abuses and infringement on Michaels' Fifth Amendment rights.

An analysis of the factors listed above demonstrates that the district court did not abuse its discretion in denying Defendants' motion. The first factor regarding the overlap of issues in criminal and civil proceedings does not weigh in favor of either party. Even now, more than a year after the district court denied Defendants' motion, there has yet to be a criminal case or even an indictment filed. As a result, it is unclear which crimes Michaels would be charged with. Even if they were to overlap, because there is not yet a criminal case, it cannot be said that this factor weighs in Defendants' favor.

Similarly, the second factor regarding the status of the criminal case does not weigh in favor of either of the parties.

> A stay of a civil case is most appropriate where a party to the civil case has already been indicted for the same conduct for two reasons: first, the likelihood that a defendant may make incriminating statements is greatest after an indictment has issued, and second, the prejudice to the plaintiffs in the civil case is reduced since the criminal case will likely be quickly resolved due to Speedy Trial Act considerations.

*Trs. of Plumbers & Pipefitters Nat. Pension Fund v. Transworld Mechanical*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995). Therefore, courts generally do not stay proceedings in the absence of an indictment. *Id*. In the instant case, an indictment had not yet issued at the time the district court denied Defendants' renewed motion to stay the proceedings. As a result, this factor and the concerns associated with it do not weigh in favor of granting the motion.

The third factor regarding the plaintiff's interests clearly weighs in favor of denying the motion. Although the FTC does not have a personal interest in moving swiftly through the case, the FTC pursued claims on behalf of consumers whose interactions with Defendants caused them to suffer great financial hardship. After following Defendants' instructions and failing to make mortgage payments, many of these individuals were able to save their homes from foreclosure by borrowing money from family or friends, but they now face worse circumstances than before they signed up and paid for Defendants' services. Some still faced foreclosure as of the time they provided their declarations. Many of Defendants' customers suffered hefty losses after paying for services that they never received. This factor weighs heavily in favor of denying the motion for a stay of proceedings because these individuals are desperate to recover their lost funds as quickly as possible.

On the other hand, the fourth factor weighs in Defendants' favor. As Defendants have repeatedly asserted, they were unable to obtain their own records from the Canadian government until it was too late to respond to the FTC's motion for summary judgment. At the time the district court denied the stay, the judge knew that the Canadian authorities had agreed to provide some of the files, but it was unclear how long that might take. Because there was no indictment, however, the Fifth Amendment concerns expressed by Defendants are not very compelling.

The fifth and sixth factors do not weigh strongly in either party's favor. It was unclear at the time the motion was filed how long a stay might last. If the court had waited for an indictment, for example, the stay would continue to this day, causing unnecessary delay for the court. Although there may have been a minimal risk of continued misconduct by Defendants because they entered into a stipulated injunction with the FTC, Defendants' former customers were in dire need of the funds that were wrongly taken from them. The public interest is furthered where individuals' injuries are remedied in a timely manner.

Because the factors, when considered together, do not weigh heavily in either party's favor, it cannot be said that the district court abused its discretion in denying Defendants' renewed motion for a stay of proceedings.

## C.       The FTC's Motion for Summary Judgment

### 1.       Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*, applying the same standards as the district court. *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether summary judgment was appropriate, this Court views the "evidence in the light most favorable to the nonmoving party." *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A genuine issue of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*. at 249.

In the instant case, the FTC's summary judgment motion was unopposed because Defendants failed to file a brief in opposition to the motion. This did not, however, end the district court's analysis. The court below acknowledged that it "may not grant Plaintiff's unopposed motion for summary judgment without conducting its own, searching review." *E.M.A. Nationwide,* 2013 WL 4545143, at *1. Even where a party "offer[s] no timely response to [a] [] motion for summary judgment, the District Court [may] not use that as a reason for granting summary judgment without first examining all the materials properly before it under Rule 56(c)." *Smith v. Hudson*, 600 F.2d 60, 65 (6th Cir. 1979). This is so because "[a] party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Id*. at 64. Therefore, even where a motion for summary judgment is unopposed, a district court must

review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists.[11]

## 2.     Analysis

The district court considered the evidence submitted by the FTC with its initial motion for a TRO and a preliminary injunction as well as the evidence submitted with its motion for summary judgment (over 2,000 pages of documents) to find that no genuine dispute of material fact existed regarding Defendants' violations of the FTC Act, the TSR, and the MARS Rule. *E.M.A. Nationwide*, 2013 WL 4545143, at *4–6. The district court also found that Defendants operated as a "common enterprise" and that Michaels and Benhaim could be held personally liable for injunctive and monetary relief for these violations. *Id*. at *6–8.

On appeal, Defendants assert some arguments that were not presented to the district court due to their failure to oppose the motion for summary judgment. These arguments were waived because they were not first considered by the district court. Although parties may brief an issue before this Court, "the failure to present an issue to the district court forfeits the right to have the argument addressed on appeal." *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006). Therefore, rather than consider Defendants' newly-asserted arguments, this Court reviews the district court's articulated analysis to ensure that it did not overlook any genuine dispute of material fact.

### a.     Violation of the FTC Act

Pursuant to Section 5 of the FTC Act, the FTC is "empowered and directed to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). "'[M]isrepresentations of material facts made for the purpose of inducing consumers to purchase services constitute unfair or deceptive acts or practices forbidden by Section 5(a).'" *F.T.C. v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988) (quoting *F.T.C. v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1291 (D. Minn. 1985)).

---

[11]However, "[n]either the trial nor appellate court . . . will *sua sponte* comb the record from the partisan perspective of an advocate for the non-moving party." *Guarino v. Brookfield Tp. Trs.*, 980 F.2d 399, 410 (6th Cir. 1992).

To prevail on this claim and to establish Defendants' liability under the FTC Act, the FTC must demonstrate that "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *F.T.C. v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). *See also F.T.C. v. Int'l Comp. Concepts, Inc.*, No. 5:94cv1678, 1995 WL 767810, at \*2 (N.D. Ohio Oct. 24, 1995).[12]

A representation is material if it is likely to affect a consumer's decision to buy a product or service. *Int'l Comp. Concepts*, 1995 WL 767810, at \*2. Defendants' representations regarding their ability to negotiate incredible debt settlement deals were certainly material. A number of Defendants' customers stated in their declarations that they had chosen not to sign with other debt relief service providers who were unable to make promises similar to those made by Defendants. Defendants' statements promising up to 70 percent reductions in mortgage or credit card debt would affect any consumer's decision to buy Defendants' services.

Determining whether the representations were deceptive and likely to mislead consumers acting reasonably under the circumstances is a slightly more complicated question in the instant case. To make this determination, a court need not find that defendants intended to deceive consumers. *See F.T.C. v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005); *United States v. Johnson*, 541 F.2d 710, 712 (8th Cir. 1976)). Instead, we look to "the likely effect the promoter's handiwork will have on the mind of the ordinary consumer." *Freecom Commc'ns*, 401 F.3d at 1202 (citing *F.T.C. v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963)). "The important criterion in determining the meaning of an advertisement is the net impression that it is likely to make on the general populace." *Nat'l Bakers Servs., Inc. v. F.T.C.*, 329 F.2d 365, 367 (7th Cir. 1964). *See also Int'l Comp. Concepts*, 1995 WL 767810, at \*3 ("In determining the message conveyed by a representation, it is the overall net impression that

---

[12]Although the FTC is not required to prove consumer reliance to establish a § 5 violation and to obtain an injunction against a wrongdoer, "such proof *is* necessary to establish the right to consumer redress." *F.T.C. v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1205 (10th Cir. 2005) (emphasis added). The FTC need not establish that a particular consumer relied on and was injured by Defendants' misrepresentations. Instead, "[t]o raise a presumption of reliance, the FTC need only show (1) the business entity made material misrepresentations likely to deceive consumers, (2) those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products." *Id*. at 1206 (citing *F.T.C. v. Kuykendall*, 371 F.3d 745, 765 (10th Cir. 2004) (en banc)). In the instant case, there is ample evidence that Defendants' misrepresentations were likely to deceive and were widely disseminated to consumers. Additionally, reams of evidence in the record demonstrate that many consumers purchased Defendants' services and lost thousands of dollars without obtaining anything in return.

counts.  Fine print or ineffective disclaimers do not change the message conveyed if the overall net impression is different.").

Defendants do not appear to contest that the representations were made or that they were material.  Defendants do, however, assert that the net impression of those representations is an issue of fact that must be decided by a jury, precluding summary judgment.  They point to their written materials, including contracts and debt relief guides, which more accurately identify the services provided by Defendants, to assert that the overall net impression of those representations was not likely to mislead and improperly induce consumers to purchase their services.

Although defendants claim that the net impression of their representations is a question of fact to be determined by a jury, courts may decide this issue on summary judgment.  *See GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 811 (6th Cir. 1999) (On summary judgment, "'we must decide whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'").  For example, the Ninth Circuit affirmed a district court's grant of summary judgment in *F.T.C. v. Cyberspace.Com, LLC*, after finding that fine print notices placed on the reverse side of documents sent to consumers were insufficient to overcome the overwhelmingly deceptive nature of the front side of the communications.  453 F.3d 1196, 1200 (9th Cir. 2006) (summarizing case law from other circuits in which fine print disclaimers are insufficient to overcome evidence of deceptive messaging).  *See also F.T.C. v. Dinamica Financiera LLC*, No. CV 09–03554 MMM PJWx, 2010 WL 9488821, at * 7 (C.D. Cal. Aug. 19, 2010) (granting summary judgment for the FTC where numerous declarations in the record demonstrated that consumers believed the defendant's misrepresentations); *F.T.C. v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) (granting summary judgment on an FTC Act claim even after the defendants presented evidence of more accurate statements and disclaimers found in consumer contracts).

Although Defendants later provided written documents, including a contract that more accurately characterized their services, there is no genuine dispute of material fact regarding the net impression of Defendants' representations to consumers.  A court need not look past the first contact with a consumer to determine the net impression from that contact, and a court may

consider individual advertisements or messages to determine the net impression. As the First Circuit has stated with regard to advertisements,

> [e]ach advertisement must stand on its own merits; even if other advertisements contain accurate, non-deceptive claims, a violation may occur with respect to the deceptive ads. Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings.

*Removatron Int'l Corp. v. F.T.C.*, 884 F.2d 1489, 1497 (1st Cir. 1989) (internal citation omitted). Similarly, the Fifth Circuit explained that in cases where a defendant deploys a marketing campaign with a series of discrete communications with consumers, "each advertisement must stand on its own merits; even if other advertisements contain accurate, non-deceptive claims, a violation may occur with respect to the deceptive advertisements." *F.T.C. v. Fin. Freedom Processing, Inc.*, 538 F. App'x 488, 489–50 (5th Cir. 2013). *See also F.T.C. v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008). Therefore, the FTC Act is violated "if the first contact or interview is secured by deception . . . , even though the true facts are made known to the buyer before he enters into the contract of purchase." *Carter Prods. v. F.T.C.*, 186 F.2d 821, 824 (7th Cir. 1951) (internal citation omitted). *See also Resort Car Rental Sys., Inc. v. F.T.C.*, 518 F.2d 962, 964 (9th Cir. 1975); *Exposition Press, Inc. v. F.T.C.*, 295 F.2d 869, 873 (2d Cir. 1961).

In the instant case, Defendants provided clearer descriptions of their services and disclaimers regarding mortgage payments in their written materials. However, these materials were only sent to consumers after the initial telephone conversations during which consumers provided personal contact and financial information and agreed to enroll in Defendants' programs. Numerous consumer declarations and scripts from E.M.A. and First United confirm that the initial telephone conversations used to solicit consumers consisted almost entirely of material misrepresentations that did, in fact, induce consumers into purchasing Defendants' services at very high costs. Defendants cannot make considerable material misrepresentations to consumers and then bury corrections and disclaimers in subsequent communications. *See F.T.C. v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) (finding

that disclaimers appearing in contracts signed by consumers were insufficient to create a genuine dispute of material fact "because each representation must stand on its own merit, even if other representations contain accurate, non-deceptive information.").

Some courts have noted that "[w]hile proof of actual deception is unnecessary to establish a violation of Section 5, such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *F.T.C. v. USA Fin., LLC*, 415 F. App'x 970, 973 (11th Cir. 2011) (internal quotation marks omitted). *See also F.T.C. v. Affiliate Strategies*, 849 F. Supp. 2d 1085, 1106 (D. Kan. 2011) (finding persuasive the fact that all consumer declarations in the record "state[d] that they purchased [the] services from [the defendant] based on telemarketers' assurances that they were guaranteed or highly likely to receive a grant. They each paid thousands of dollars . . . with the understanding that [they would receive the promised service].").

In the present case, it is clear from the evidence in the record that Defendants' messages actually deceived consumers, leading them to sign contracts for services promised during their initial telephone conversations with Defendants' telemarketers. Although actual consumer deception is not necessary to establish Defendants' violation of Section 5, the fact that so many consumers were persuaded by Defendants' representations is highly probative of their deceptiveness. Even when viewed together, the net impression of the various contacts between consumers and Defendants is one of misrepresentation and deception. The disclaimers and more accurate information were buried in written documents received by consumers only after they were misled into purchasing Defendants' services. And even after consumers signed the more accurate contracts and received the debt management guides, Defendants continued to mislead their clients. It is clear from the record that Defendants' telemarketers continued to deliver inaccurate and deceptive messages during subsequent follow-up calls. Consumer declarations demonstrate that numerous communications before and after the contract-signing led them to pay thousands of dollars for Defendants' services.

Therefore, the district court did not err in granting summary judgment on this claim.

### b.          Violations of the TSR

Like the FTC Act, the TSR targets deceptive messaging by prohibiting sellers or telemarketers from using "deceptive telemarketing acts or practices."   16 C.F.R. § 310.3. "Identical principles of deception from Section 5 of the FTC Act apply to the TSR, and a violation of the TSR amounts to both a deceptive act or practice and a violation of the FTC Act." *F.T.C. v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1273 (M.D. Fla. 2012).  *See also F.T.C. v. Stefanchik*, 559 F.3d 924, 929–30 (9th Cir. 2009).

The FTC asserted and the district court agreed that Defendants violated the TSR by (1) misrepresenting the total cost of their services, in violation of 16 C.F.R. § 310.3(a)(2)(i); (2) misrepresenting material aspects of their services, in violation of § 310.3(a)(2)(iii); (3) requesting and receiving fees before negotiating or settling the terms of consumers' debts, in violation of § 310.4(a)(5)(i); and (4) calling numbers on the National Do Not Call Registry, in violation of § 310.4(b)(1)(iii)(B).     Sufficient evidence in the record establishes that Defendants' telemarketers made each of the above-mentioned material misrepresentations, leading consumers to purchase their services.   Additionally, numerous declarations in the record establish that Defendants' telemarketers called consumers whose numbers were listed on the National Do Not Call Registry.  For example, declarant Jeffrey Berry stated that since January 15, 2006, he has been registered on the FTC's Do Not Call Registry.  Despite that fact, he was contacted by a First United representative in March 2012, who sought personal information from him, including his Social Security number.  Another declarant, Vivian Allen, indicated that her number was registered on the Do Not Call Registry at the time she received her first phone call from a New Life representative.  Neither of these individuals had prior existing business relationships with Defendants.

The only argument asserted by Defendants regarding their violations of the TSR is that the contracts signed by consumers correctly set forth the fees to be paid and services to be rendered by Defendants.  As explained above, however, the net impression of the telemarketers' representations to consumers was deceptive and likely to mislead consumers acting reasonably under the circumstances.

### c.          Violations of the MARS Rule

The MARS Rule, almost all of which went into effect on December 29, 2010,[13] prohibits entities offering mortgage relief services from making certain representations and engaging in certain deceptive practices. Among other things, these entities are prohibited from doing the following: (1) representing that a consumer "cannot or should not contact or communicate with his or her lender or servicer"; (2) misrepresenting "[t]he likelihood of negotiating, obtaining, or arranging any represented service or result"; (3) misrepresenting that "a mortgage assistance relief service is affiliated with, endorsed or approved by, or otherwise associated with . . . [t]he United States government . . . [or t]he maker, holder, or servicer of the consumer's dwelling loan"; and (4) "[r]equest[ing] or receiv[ing] payment of any fee or other consideration until the consumer has executed a written agreement between the consumer and the consumer's dwelling loan holder." 12 C.F.R. §§ 1015.3, 1015.5. Additionally, as the district court properly recognized, mortgage assistance relief service providers must make disclosures that they are "not associated with the government, . . . [that their] service is not approved by the government or [the consumer's] lender[,]" and that they may cancel the service at any time. 12 C.F.R. §§ 1015.4(a)(1), (b)(1).

There is clear, undisputed evidence in the record that Defendants made verbal representations in violation of the MARS Rule and that their written documents violated elements of the Rule as well.[14] First, there is ample evidence that after the effective date of the Rule, Defendants told consumers not to speak with their mortgage lenders (both orally and in their written materials). For example, in July 2011, consumer Gloria Bernardo was instructed by a New Life representative not to pay her mortgage lender and not to answer the lender's calls. Elisea R. Cadaoas received similar instructions from a New Life representative in June 2011. She described her encounter with New Life as follows:

---

[13]The advance fee ban contained in 12 C.F.R. § 1015.5 went into effect on January 31, 2011.

[14]Although Defendants claim that they could not have violated the MARS Rule because their "customer contracts explicitly provided that New Life contracted to provide its customers financial consulting services—*not* mortgage assistance relief services," Defs.' Br. at 54, it is clear from consumer declarations that New Life represented itself as an entity providing mortgage relief services and consumers relied on those representations.

> Kane instructed me to no longer send my mortgage payment directly to American Home Mortgage. Instead, I would now pay New Life . . . and New Life would pay American Home Mortgage. . . . Kane told me that I did not have to accept calls from American Home Mortgage unless I wanted to do so. Kane also told me not to worry. I put my trust in Kane and New Life.

(R. 5-3, Mot. for TRO Ex. Vol. II, at 514.)  Defendants' own debt appraisal guide, which Bernardo, Cadaoas, and others received after enrolling in Defendants' mortgage debt relief services, instructed consumers not to contact their lenders. The Guide states, "If you are in the process of dealing with collectors, you must always remember: <u>DO NOT SPEAK TO YOUR CREDITORS UNTIL YOU HAVE MAPPED OUT A CLEAR SOLUTION TO THE PROBLEM!</u>" (*Id*. at 382.)

Further, the record contains undisputed evidence that Defendants misrepresented the amount of relief consumers could obtain from their services and requested fees from consumers without first obtaining agreements from their lenders. For example, Katherine Patten explained in her declaration that she began receiving calls from First United in May 2012 offering her incredible mortgage debt relief and requesting fees before ever procuring an arrangement with her lender. During those calls, she explains, "[Their representative] told me that 1st United could eliminate the $110,000 that I was in arrears on my mortgage and bring my payments down to $550.00 per month for four months. [I believed] that if I successfully paid 1st United . . . , they would begin negotiations with Chase." (R. 5-4, Mot. for TRO Ex. Vol. III, at 748.)

Defendants also failed to make disclosures regarding their lack of association with the government, the fact that their service was not approved by the government or the lender, and that the service could be canceled at any time. For example, during a conversation between First United representative Brandon Smith and an undercover FTC agent, Smith failed to include any of the required disclosures. Additionally, "none of the scripts [in the record] include a disclosure that the Defendants are not associated with the government or consumer's lenders." (R. 157-2, Mot. for Summ. J., Ex. Vol. I, at 2935.) In fact, many of Defendants' representatives made false representations that the program *was* affiliated with the Obama administration. For example, one consumer's declaration described a telephone conversation with a New Life telemarketer as follows: "Kane told me New Life helped homeowners lower their mortgage [loans] . . . through a program initiated by President Obama." (R. 5-3, Mot. for TRO Ex. Vol. II, at 536.)

Defendants claim that "[e]ven if New Life made such representations or engaged in this conduct, it is not evidence that E.M.A. violated the law . . . . [because] the District Court cites to no evidence that E.M.A. represented it would provide mortgage assistance relief services, or made any prohibited representations in connection with . . . such services." Defs.' Br. at 55. Although none of the evidence in the record links E.M.A. to mortgage debt relief services or any substantial activity after the effective date of the MARS Rule, each of these corporations is to be held jointly and severally liable as they are part of a common enterprise, as explained below.

#### d.          Imposition of Joint and Several Liability Against All Defendants
##### i.          Individual Liability of Michaels and Benhaim

"To obtain injunctive relief against an individual for a business entity's acts or practices, the FTC must prove the entity violated § 5. The FTC must further show the individual participated directly in the business entity's deceptive acts or practices, or had the authority to control them." *Freecom Commc'ns*, 401 F.3d at 1203 (internal citation omitted). Additionally, the FTC must put forth evidence to show that the individual defendant "knew or should have known of the alleged deceptive misrepresentation." *Wash. Data Res.*, 856 F. Supp. 2d at 1276. Finally, in order to obtain monetary redress from any defendant, "the FTC must proffer evidence tending to show consumers actually relied on the entity's deceptive acts or practices to their detriment." *Freecom Commc'ns*, 401 F.3d at 1203.

In the instant case, there is no genuine dispute of fact regarding whether Michaels and Benhaim, who repeatedly identified themselves as president and vice president of each of the corporate entities and who controlled the bank accounts for the Canadian corporations, participated in the corporations' deceptive acts. If status as a controlling shareholder of a closely-held corporation creates an inference that an individual had authority to control corporate acts, *see id.* at 1205, then the president and vice president of these corporate defendants certainly had such authority. Additionally, it is clear that Benhaim and Michaels knew or should have known of the corporate defendants' misrepresentations. The record demonstrates that third party payment processors forwarded consumer and state attorneys general complaints to Benhaim at james@newlifeconsultants.net and jb@emaonline.net. Benhaim replied to a number of these emails, demonstrating his knowledge of consumers' frustrations with his companies. Additional

evidence in the record, including the individual defendants' involvement in the leadership of these entities, establishes that Benhaim and Michaels had or should have had knowledge regarding the defendant corporations' activities and had the authority to control their deceptive acts. Finally, as explained above, consumers clearly relied on Defendants' deceptive acts and communications—numerous consumers, who now face bad credit and/or foreclosure due to their interactions with Defendants, paid thousands of dollars in reliance on Defendants' misrepresentations. Therefore, the district court did not err in holding Benhaim and Michaels liable for the acts of the corporate defendants.

### ii.          Common Enterprise

Although the common enterprise theory of liability had not been adopted by this Court prior to this case, numerous other courts have applied this principle to similar factual situations, and we agree with the district court that it should apply here as well.[15] Under this theory, "[i]f the structure, organization, and pattern of a business venture reveal a 'common enterprise' or a 'maze' of integrated business entities, the FTC Act disregards corporateness." *Wash. Data Res.*, 856 F. Supp. 2d at 1271. Courts generally find that a common enterprise exists "if, for example, businesses (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." *Id*.

Under a somewhat similar theory, this Court in *P.F. Collier & Son Corp. v. F.T.C.*, 427 F.2d 261, 270 (6th Cir. 1970), considered a number of similar factors to find that a parent company "so dominated and controlled the acts of its . . . subsidiaries, that the corporate identities of the latter [could] be ignored, and the parent held vicariously liable for their acts." The Court found that "many of the men who directed the policy and operations of [the parent company] also directed the policy and operations of its wholly-owned subsidiaries," *id*. at 267–68, and that the subsidiaries were created, dissolved, and replaced "often for purposes unessential and unrelated to the maintenance of corporate vitality," *id*. at 268. Additionally, the Court observed that "corporate agents of the old and new subsidiaries were practically all the same

---

[15] *See, e.g., F.T.C. v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 635 (7th Cir. 2005); *Zale Corp. & Corrigan-Republic, Inc. v. F.T.C.*, 473 F.2d 1317, 1321–22 (5th Cir. 1973); *Del. Watch Co. v. F.T.C.*, 332 F.2d 745, 746 (2d Cir. 1964); *F.T.C. v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1201–02 (C.D. Cal. 2000); *F.T.C. v. Wolf*, 1997-1 Trade Cases P71, 713, 1996 WL 812940, *7–8 (S.D. Fla. Jan. 31, 1996).

people, albeit, perhaps, with different titles and occupying different positions," *id*. at 269,  that "elements within the [defendant's] corporate complex ha[d] never dealt with each other as independent commercial entities, and that they ha[d] interchanged business functions as the circumstances warranted in a manner which was wholly inconsistent with any purported corporate separation between the [companies]," *id*. at 270.

Although *P.F. Collier & Son* is not entirely on point, the factors considered by that Court are instructive in this case, as are the factors generally considered under the common enterprise theory.  The record could not be clearer that each of the corporate and individual defendants made up a messy maze of interrelated business entities, meeting each of these factors.  Benhaim sent emails as president of E.M.A. concerning the administration of New Life and copied Michaels.  The corporations had many overlapping employees and administrators, which is evidenced by declarations, corporate documents, and emails between Defendants, their employees, and their third party payment processors.  The Canadian corporations paid wages to employees of the three American corporations, and funds were transferred frequently between the American and Canadian corporations' bank accounts.  The corporations shared phone numbers, and the same individuals purchased URLs and email accounts for the corporate entities.  Finally, each American corporation was dissolved and replaced by another corporation that followed almost identical business models and used similar written materials when interacting with clients.

The district court did not err in imposing joint and several liability because there was no genuine dispute of material fact regarding Defendants' interrelated activities.

## III.

## CONCLUSION

For the foregoing reasons, this Court **AFFIRMS** the district court's decisions denying Defendants' motions for further discovery and a stay of proceedings and granting the FTC's motion for summary judgment.