Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued April 21, 2003       Decided July 11, 2003

No. 02-5144

ALLIED PILOTS ASSOCIATION, ET AL.,
APPELLANTS

v.

PENSION BENEFIT GUARANTY CORPORATION, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 00cv03113)

---

*Kathy L. Krieger* argued the cause for appellants. With her on the briefs was *Edgar N. James*. *Clay Warner* and *Michael E. Abram* entered appearances.

*Jeffrey B. Cohen*, Deputy General Counsel, Pension Benefit Guaranty Corporation, argued the cause for appellee. With him on the brief were *James J. Keightley*, General Counsel, and *John A. Menke* and *Paula J. Connelly*, Senior Counsel.

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*David P. Gersch* argued the cause for appellees Pichin Corporation and Icahn Associates Corporation. With him on the brief was *John D. Daley*.

Before: GINSBURG, *Chief Judge*, and EDWARDS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: This case arises out of a settlement agreement concerning Trans World Airlines' employee pension plans. Agreed to over a decade ago by TWA, TWA's employees, the financier Carl Icahn, and the Pension Benefit Guaranty Corporation (PBGC), the agreement required the PBGC to terminate the plans if certain defined "Significant Events" were to occur. Eight years later, when one of the "Significant Events" occurred, the PBGC terminated the plans, and now a group of pilots sue the PBGC, claiming that termination, even if mandated by the settlement agreement, violates federal law. Because we conclude that federal law authorizes the PBGC to enter into settlement agreements like the one challenged in this case, we agree with the district court that the PBGC's termination of TWA's pension plans was permissible.

# I.

Title IV of the Employee Retirement Income Security Act, 29 U.S.C. § 1301 *et seq.*, created the Pension Benefit Guaranty Corporation—"a wholly owned United States Government corporation, modeled after the Federal Deposit Insurance Corporation," *PBGC v. LTV Corp.*, 496 U.S. 633, 636–37 (1990) (internal citation omitted), to enforce and administer "a mandatory Government insurance program . . . protect[ing] the pension benefits of over 30 million private-sector American workers who participate in plans covered by the Title," *id.* at 637. This case concerns the PBGC's authority to terminate pension plans involuntarily, meaning that the PBGC assumes trusteeship and uses the plan's remaining assets, supplemented by the PBGC's own funds, to pay employees a percentage of benefits owed, as determined by

ERISA and regulations promulgated thereunder. *Id.* at 637–38.

The PBGC "may institute proceedings . . . to terminate a plan whenever it determines that" one of four criteria, which measure the plan's inability to meet future liabilities, is satisfied. 29 U.S.C. § 1342(a). Specifically, it may terminate a plan if

>    (1) the plan has not met the minimum funding standard required [by certain provisions of the tax code],

>    (2) the plan will be unable to pay benefits when due,

>    (3) the reportable event described in section 1343(c)(7) of this title has occurred, or

>    (4) the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated.

*Id.* The PBGC initiates the termination process by "issuing a notice . . . to a plan administrator [of the PBGC's] determin[ation] that the plan should be terminated." *Id.* § 1342(c). If the plan administrator challenges the PBGC's determination, the PBGC "may, upon notice to the plan administrator, apply to the appropriate United States district court for a decree adjudicating that the plan must be terminated." *Id.* If the terminated plan lacks sufficient funds to satisfy existing obligations to employees, thus requiring the PBGC to use its own funds to pay benefits, the PBGC has authority to recover "the total amount of the unfunded benefit liabilities," *id.* § 1362(a), (b), from the plan's sponsor and members of the sponsor's "controlled group," i.e., entities that belong to the same corporate family as the sponsor, *id.* § 1301(a)(14)(A), (B) (incorporating by reference Internal Revenue Service regulations defining "common control"). ERISA authorizes the PBGC "to make arrangements with [plan] sponsors and members of their controlled groups who are or *may become* liable under [ERISA] for payment of their liability." *Id.* § 1367 (emphasis added).

In January 1992, Trans World Airlines filed for Chapter 11 bankruptcy in the United States District Court for the District of Delaware. Responding to a proposed reorganization plan that would have severed financier Carl Icahn's "controlled group" affiliation with TWA, the PBGC announced its intention to terminate TWA's pension plans before the proposed reorganization plan could be confirmed and to pursue TWA and Icahn for $1.124 billion in alleged underfunding. In order to forestall or prevent termination, TWA, TWA's unions, Icahn, and the PBGC entered into a Comprehensive Settlement Agreement (CSA). As ably summarized by the district court, the CSA contained the following relevant provisions:

> (1) Carl Icahn would loan TWA $200 million; (2) An Icahn entity (Pichin [Corporation], a named defendant in this suit) would sponsor the pension plans instead of TWA. Thus, Icahn became responsible for making the minimum funding contributions and TWA was released from all liability for the plans; (3) TWA was to issue $300 million in notes to make part of the annual pension plan contributions in compliance with ERISA and provisions of the Internal Revenue Code; (4) PBGC would not terminate the plans and would release TWA and Icahn from all future termination liability, except for what was agreed to in the CSA; (5) PBGC would, at Icahn's request, terminate the plans if a "*Significant Event*," as defined in the CSA, occurred and; (6) that in the event of a Significant Event requiring termination, Icahn's liability to PBGC would be limited to $240 million.

*Air Line Pilots Ass'n v. PBGC*, 193 F. Supp. 2d 209, 213 (D.D.C. 2002) (emphasis in original). In 1992, the bankruptcy court approved a reorganization plan incorporating the CSA. *In re Trans World Airlines, Inc.*, No. 92–115 (Bankr. D. Del. Dec. 30, 1992) (Order Authorizing and Approving Settlement and Compromise Among the Debtor, Pension Benefit Guaranty Corporation, the Icahn Entities, the Official Unsecured

Creditors' Committee, and the Debtor's Unions) ("Bankruptcy Order").

Eight years later, Pichin gave notice to the CSA signatories that a defined "Significant Event" had occurred—namely, an unfavorable Internal Revenue Service ruling concerning Icahn's tax liabilities for serving as plan sponsor. In January 2001, TWA, Pichin, and the PBGC signed an agreement that terminated the plans.

Two TWA pilots and the Air Line Pilots Association ("pilots") filed suit in the United States District Court for the District of Columbia against the PBGC and Pichin. Disputing neither that a "Significant Event" had occurred, nor that the CSA, which the pilots' union had signed, mandated termination of TWA's plans, the pilots contended that the PBGC had exceeded its statutory authority by terminating a plan based on the terms of a non-statutory, private law agreement such as the CSA, rather than based on ERISA's criteria for involuntary terminations. On cross motions for summary judgment, the district court ruled for the PBGC and Pichin. Although the court accepted the pilots' premise that the PBGC may not terminate plans based on factors other than the ERISA criteria, it found that the PBGC's action was neither arbitrary nor capricious because it had made an ERISA-based determination in 1992 and that the decision to terminate in 2001 rested on the 1992 determination. *Air Line Pilots Ass'n*, 193 F. Supp. 2d at 216–21.

The pilots appeal, with the Allied Pilots Association—which assumed collective bargaining responsibilities for TWA's pilots after TWA's acquisition by American Airlines, Inc.— substituted for the Air Line Pilots Association. We review the district court's grant of summary judgment de novo. *Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C. Cir. 1997).

## II.

On appeal, the pilots argue (1) that the PBGC failed to make an administrative determination in 1992 that the TWA pension plans satisfied ERISA's involuntary termination criteria and (2) that even if the PBGC made a proper determina-

tion in 1992, it acted arbitrarily and capriciously by failing to make a second such determination in 2001 before formally terminating the plans. The PBGC replies (1) that it in fact made the requisite determination in 1992 and (2) that ERISA authorizes it to enter into agreements, like the CSA, which postpone—possibly indefinitely—execution of the 1992 termination decision.

We begin with the parties' disagreement over whether the PBGC actually determined in 1992 that the TWA plans met ERISA's involuntary termination criteria. The bankruptcy court's order approving TWA's reorganization plan makes clear that the PBGC made just such a determination: "PBGC has indicated that, absent the [CSA], PBGC would seek termination of [TWA's pension plans] in advance of severance of the controlled group affiliation between TWA and the Icahn Entities and TWA's emergence from bankruptcy." Bankruptcy Order at 5. Because the pilots were party to the 1992 litigation and never contested this finding, it is res judicata here. *See*, *e.g.*, *Nevada v. United States*, 463 U.S. 110, 129–30 (1983) ("[T]he doctrine of res judicata provides that when a final judgment has been entered on the merits of a case, '[i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'" (internal citation omitted)).

The pilots argue that the PBGC's notification of intent to terminate the plans should not be considered a formal administrative determination, but rather a mere "bargaining position." Appellants' Br. at 40 (internal quotation marks omitted). We disagree. ERISA, which authorizes the PBGC to terminate a plan "whenever it determines that" one of four criteria is met, 29 U.S.C. § 1342(a), imposes no procedural strictures on the PBGC other than requiring it to "issu[e] a notice . . . to a plan administrator [that the PBGC] has determined that the plan should be terminated" before seeking either district court enforcement or voluntary settlement, *id.* § 1342(c). So when the PBGC notified TWA that, absent

ratification of the CSA, it intended to terminate the plans, it made exactly the determination that ERISA requires. True, the PBGC chose not to seek district court enforcement after the parties ratified the CSA, but that in no way changes the fact that the PBGC actually determined in 1992 that ERISA authorized involuntary termination.

The pilots next argue that the district court erred because it acted on a record that included only agency affidavits and the bankruptcy court's recitation, not the PBGC's administrative record. Although we did vacate a district court judgment for want of a formal administrative record in *American Bioscience, Inc. v. Thompson*, 243 F.3d 579 (D.C. Cir. 2001), and the Supreme Court did the same in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), those cases decided an issue distinguishable from the one we face here. Both cases hold that district courts must review "the full administrative record[s] that w[ere] before the [agencies] at the time [they] made [their] decision[s]"—rather than "litigation affidavits" offering " 'post hoc' rationalizations"—prior to determining whether agency decisions complied with applicable statutes. *Id.* at 420. Here, in contrast, we need not consider whether the PBGC's 1992 determination complied with ERISA—in fact, the pilots' briefs nowhere deny that the PBGC would have been justified in involuntarily terminating the plans in 1992—but only whether the PBGC actually made such a determination. The bankruptcy court's recitation answers that question.

Turning to the pilots' claim that the PBGC acted arbitrarily and capriciously by failing to make a second involuntary termination determination in 2001, we begin by observing that the CSA provides that TWA's pension plans "*shall . . . be terminated under* [29 U.S.C. § 1342] *. . . after the occurrence of a Significant Event as defined herein.*" Given the well-recognized principle that "[t]he word 'shall' is ordinarily [t]he language of command," *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) (internal quotation marks and citations omitted), this provision leaves no doubt that, under the terms of the CSA, the PBGC was obligated to terminate the plans when the Significant Event occurred—regardless of whether

the criteria for involuntary termination were satisfied at that time.

We have no doubt, moreover, that in view of the Supreme Court's admonition that "[i]n enacting Title IV, Congress sought to ensure that employees and their beneficiaries would not be completely deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans," *LTV Corp.*, 496 U.S. at 637 (internal quotation marks omitted), the PBGC has statutory authority to postpone termination until occurrence of a defined event where, as here, the PBGC agrees to do so as one element of a liability settlement aimed at preventing termination altogether. The PBGC's general authority to enter into liability settlements comes from ERISA section 4067, which empowers the PBGC "to make arrangements with [plan] sponsors and members of their controlled groups who are or *may become* liable under [the statute] for payment of their liability." 29 U.S.C. § 1367 (emphasis added). As the bankruptcy court found, the PBGC entered into the CSA pursuant to its section 4067 authority. Bankruptcy Order at 5. Under the CSA, Icahn agreed to accept the ongoing role of plan sponsor and to contribute funds to shore up the plans; in return, the PBGC agreed to postpone—perhaps indefinitely—its termination of TWA's plans, to cap Icahn's direct liability in the event of termination at $240 million, and to terminate the plans, upon request, if Icahn received unfavorable tax treatment concerning his status as plan sponsor. Each of these promises and counter-promises formed an integral part of the overall negotiated settlement, whose purpose was to prevent termination altogether. Though the CSA failed to achieve that goal, it did postpone termination for eight years, during which time the maximum amount that the PBGC pays beneficiaries of terminated pension plans increased 44%, from $28,227 to $40,705 per year. *See* Benefits Payable in Terminated Single–Employer Plans, 29 C.F.R. § 4022.22(b) & pt. 4022, app. D (increase from 1992 to 2001).

The judgment of the district court is affirmed.

*So ordered.*