RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0389p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DENNIS BLACK; CHARLES CUNNINGHAM; KENNETH
HOLLIS; DELPHI SALARIED RETIREE ASSOCIATION,
                    *Plaintiffs-Appellants*,

                                                        No. 19-1419

            *v.*


PENSION BENEFIT GUARANTY CORPORATION,
                    *Defendant-Appellee*.

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:09-cv-13616—Arthur J. Tarnow, District Judge.

Argued:  January 28, 2020

Decided and Filed:  December 28, 2020

Before:  SILER, GIBBONS, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Anthony F. Shelley, MILLER & CHEVALIER CHARTERED, Washington, D.C., for Appellants.  John A. Menke, PENSION BENEFIT GUARANTY CORPORATION, Washington, DC.., for Appellee.  **ON BRIEF:**  Anthony F. Shelley, Timothy P. O'Toole, Michael N. Khalil, MILLER & CHEVALIER CHARTERED, Washington, D.C., for Appellants. John A. Menke, C. Wayne Owen, Jr., Craig T. Fessenden, Erin C. Kim, Elisabeth B. Fry, PENSION BENEFIT GUARANTY CORPORATION, Washington, DC.., for Appellee.

———————————

**AMENDED OPINION**

———————————

SILER, Circuit Judge.  Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA") creates an insurance program to protect employees' pension benefits.  The Pension Benefit Guaranty Corporation ("PBGC")—a wholly-owned corporation of the United States government—is charged with administering the pension-insurance program.

In this case, PBGC terminated the "Salaried Plan," a defined-benefit plan sponsored by Delphi Corporation.  The termination was executed through an agreement between PBGC and Delphi pursuant to 29 U.S.C. § 1342(c).  The appellants—retirees affected by termination of the Salaried Plan—bring several challenges to the termination.  First, the retirees argue that section 1342(c) requires a judicial adjudication before a pension plan may be terminated.  Second, the retirees contend that termination of the plan violated their due process rights.  Third, the retirees assert that PBGC's decision to terminate the Salaried Plan was arbitrary and capricious.

But the retirees' arguments do not require reversal.  First, subsection 1342(c) permits termination of distressed pension plans by agreement between PBGC and the plan administrator without court adjudication.  Second, the retirees have not demonstrated that they have a property interest in the full amount of their vested, but unfunded, pension benefits.  Third, PBGC's decision to terminate the Salaried Plan was not arbitrary and capricious.  We affirm.

I.

Delphi Corporation—an automotive parts supplier and former subsidiary of General Motors Corporation ("GM")—was plan administrator and contributing sponsor of several defined-benefit pension plans.  The plan at issue here, the Salaried Plan, covered approximately 20,000 members of Delphi's salaried, non-unionized workforce, including appellants Dennis Black, Chuck Cunningham, and Ken Hollis ("retirees").

In 2005, Delphi filed a voluntary petition for Chapter 11 bankruptcy. As a result, Delphi stopped paying the required contributions to its pension plans, including the Salaried Plan.

In 2008, Delphi's first Plan of Reorganization ("2008 POR") provided that all Delphi sponsored pension plans would be frozen but would continue to be reorganized under Delphi. But the 2008 POR failed when Delphi's post-emergence investors refused to fund their investment agreement with Delphi.

As a result, Delphi asked GM to assume the liabilities of the Salaried Plan. It appears that PBGC was initially in favor of this arrangement.

Even so, GM was facing financial struggles of its own as a result of the financial crisis of 2008. An "Auto Taskforce" was appointed to oversee efforts to support and stabilize the auto industry and an "Auto Team" was created by the United States Department of Treasury to evaluate the restructuring plans of automotive companies and to negotiate the terms of any further assistance. *See* Christy L. Romero, *Treasury's Role in the Decision for GM to Provide Pension Payments to Delphi Employees* 3 (Aug. 15, 2013) (hereinafter "SIGTARP Report"), https://www.sigtarp.gov/Audit%20Reports/SIGTARP_Delphi_Report.pdf. In 2009, Treasury's Auto Team agreed to give GM $30.1 billion in Troubled Asset Relief Program ("TARP") funds conditioned on GM's completing a 40-day, "quick-rinse" bankruptcy. *Id.* at 35.

Eventually, an agreement was made to save the pension plan of the hourly, unionized Delphi employees ("Hourly Plan") but terminate the Salaried Plan. Pursuant to this agreement, GM would assume the Hourly Plan pension liabilities and PBGC would terminate the Salaried Plan and release any remaining liens and claims on Delphi's assets.

In June 2009, Delphi moved to modify its First Amended Plan of Reorganization to reflect the agreement to save the Hourly Plan and terminate the Salaried Plan. *In re Delphi Corp.*, No. 05-44481, Dkt. No. 17030 (Bankr. S.D.N.Y. June 1, 2009). The retirees filed an objection to Delphi's Modified Plan in the bankruptcy proceedings. *Id.* at Dkt. No. 18277 (Bankr. S.D.N.Y. July 15, 2009).

Then, on July 22, 2009, PBGC issued a Notice of Determination to Delphi, notifying Delphi that it had determined that the Salaried Plan must be terminated and that PBGC should be appointed as statutory trustee of the plan. PBGC issued a press release to notify plan participants of its decision. Pension Benefit Guaranty Corporation, *PBGC to Assume Delphi Pension Plans*

(July 22, 2009), https://www.pbgc.gov/news/press/releases/pr09-48. That same day, PBGC initiated an action in district court to adjudicate termination of the Salaried Plan. *See Pension Benefit Guar. Corp. v. Delphi Corp.*, No 2:09-cv-12876 (E.D. Mich. filed July 22, 2009).

On July 29, 2009, the retirees argued in support of their objection to the proposed modifications to the First Amended Plan of Reorganization. *See In re Delphi Corp.,* No. 05-44481, Dkt. Nos. 18668, 18707 (Bankr. S.D.N.Y. July 30, 2009).

On July 30, 2009, the bankruptcy court overruled the retirees' objections and confirmed Delphi's Modified Chapter 11 Plan. *In re Delphi Corp.*, No. 05-44481, 2009 WL 2482146 at Dkt. No. 1 (Bankr. S.D.N.Y. July 30, 2009).

On August 6, 2009, the retirees sought PBGC's consent to intervene in the termination proceedings in district court. On August 7, 2009, PBGC voluntarily dismissed the termination suit in district court. Then, on August 10, 2009, PBGC and Delphi executed a termination and trusteeship agreement that terminated the Salaried Plan effective July 31, 2009.

Subsequently, in September 2009, the retirees filed this lawsuit. After protracted litigation, the district court granted summary judgment in favor of PBGC. This appeal followed.

## II.

We review a district court's grant of summary judgment de novo, "applying the same standards as the district court." *Morehouse v. Steak N Shake*, 938 F.3d 814, 818 (6th Cir. 2019) (quoting *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 629 (6th Cir. 2014)). "Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (internal quotations omitted); *see also* Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, we review the evidence in the light most favorable to the nonmoving party. *Morehouse*, 938 F.3d at 818. But, "[w]here, as here, the parties filed cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under

consideration." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) (internal quotations omitted).

## III.

The retirees contend that 29 U.S.C. § 1342(c) requires a judicial adjudication prior to termination of a distressed pension plan. They also argue that their due process rights were violated and that PBGC's decision was arbitrary and capricious. We begin with interpretation of section 1342.

## A.

*Interpretation of 29 U.S.C. § 1342.* Section 1342 outlines the procedure for institution of proceedings by PBGC to terminate a distressed pension plan. After reviewing the statutory text comprehensively and applying relevant canons of statutory interpretation, we conclude that subsection 1342(c)(1) provides two alternative mechanisms for terminating a distressed pension plan: (1) by application to a United States district court for a decree that the plan must be terminated, or (2) by agreement between PBGC and the plan administrator.

Here, the parties dispute the appropriate statutory procedure for termination of a pension plan by PBGC. The retirees contend that subsection 1342(c) requires that PBGC obtain a judicial decree before terminating a distressed pension plan. But PBGC correctly argues that the statutory scheme provides two procedural alternatives for terminating a distressed pension plan, including by agreement between PBGC and the plan administrator.

To resolve this dispute, we begin by examining the statutory text. "We endeavor to 'read statutes . . . with an eye to their straightforward and commonsense meanings.'" *Bates v. Dura Auto. Sys., Inc.*, 625 F.3d 283, 285 (6th Cir. 2010) (quoting *Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 910 (6th Cir. 2000)). And we give "terms the ordinary meaning that they carried when the statute was enacted." *Norfolk S. Ry. v. Perez*, 778 F.3d 507, 512 (6th Cir. 2015). The Supreme Court has called on "judicial interpreter[s] to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." *Hueso v. Barnhart*, 948 F.3d 324, 333 (6th Cir. 2020) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The*

*Interpretation of Legal Texts* § 24, at p. 167 (2012) and citing *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017)).   Lastly, before deferring to an administrative agency's statutory interpretation, courts "must first exhaust the 'traditional tools' of statutory interpretation and 'reject administrative constructions' that are contrary to the clear meaning of the statute." *Arangure v. Whitaker*, 911 F.3d 333, 336 (6th Cir. 2018) (quoting *Chevron USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).

Section 1342 has several subsections.  Subsection 1342(a) says that PBGC "may institute proceedings under this section to terminate a plan" when PBGC determines that certain specified criteria are met.   29 U.S.C. § 1342(a).   But the statute does not specify what type of "proceedings" may be initiated to terminate a pension plan.  At the time the statute was written, "proceeding" could have several meanings, including: "action or course of action[,] . . . a particular course of action . . .  [or a] legal action."  Proceeding, *Webster's New Twentieth Century Dictionary of the English Language* 1434 (2d ed. 1979).  Thus, proceedings are not necessarily limited to a judicial adjudication, but may also contemplate an administrative proceeding or some other course of action.

Subsection 1342(b) provides for appointment of a trustee after initiation of termination proceedings.  Subsection (b)(1) authorizes PBGC to apply to the United States district court for appointment of a trustee to administer the plan "pending the issuance of a decree under subsection (c) ordering the termination of the plan."   29 U.S.C. § 1342(b)(1).   Even so, subsection (b)(3) allows PBGC and the plan administrator to agree "to the appointment of a trustee without proceeding in accordance with the requirements of paragraphs [(b)](1) and [(b)](2)." *Id.* § 1342(b)(3).

Subsection 1342(c) is the primary subsection at issue here.  The title of the subsection, "[a]djudication that plan must be terminated," may lend some support to the retirees' assertion that an adjudication must occur before a pension plan is terminated. *Id.* § 1342(c). Still, while subsection titles "are of use [ ] when they shed light on some ambiguous word or phrase . . . they cannot undo or limit what the text makes plain." *Brotherhood of Ry. Trainmen v. Baltimore & Ohio Ry.*, 331 U.S. 519, 529 (1947).  Thus, we look to the subsection's substantive text.

The first sentence of subsection 1342(c)(1) says that when PBGC commences proceedings under subsection (a) "it *may* . . . apply to the appropriate United States district court for a decree adjudicating that the plan must be terminated . . . ." 29 U.S.C. § 1342(c)(1) (emphasis added).    Similarly, the second sentence states, "If the trustee appointed under subsection (b) disagrees with the determination of the corporation under the preceding sentence he *may* intervene in the proceeding relating to the application for the decree, or make application for such decree himself." *Id.* (emphasis added).

Next, the third sentence says that;

> Upon granting a decree for which the corporation or trustee has applied under this subsection the court shall authorize the trustee appointed under subsection (b) (or appoint a trustee if one has not been appointed under such subsection and authorize him) to terminate the plan in accordance with the provisions of this subtitle.

*Id.* This sentence simply states that *if* a judicial decree is granted that "the court shall authorize the trustee . . . to terminate the plan in accordance with the provisions of this subtitle." *Id.*

Now, we turn to the main sentence in dispute. In its entirety, the fourth sentence of subsection (c)(1) says:

> If the corporation and the plan administrator agree that a plan should be terminated and agree to the appointment of a trustee without proceeding in accordance with the requirements of this subsection (other than this sentence) the trustee shall have the power described in subsection (d)(1) and, in addition to any other duties imposed on the trustee under law or by agreement between the corporation and the plan administrator, the trustee is subject to the duties described in subsection (d)(3).

*Id.* The fourth sentence presents a conditional if-then proposition. If the first two conditions are met—"the [PBGC] and the plan administrator agree that a plan should be terminated and agree to the appointment of a trustee"—then "the trustee shall have the power described in subsection (d)(1) and . . . is subject to the duties described in subsection (d)(3)." *Id.*

But the proper interpretation of part of the second clause of the fourth sentence—"without proceeding in accordance with the requirements of this subsection (other than this sentence)"—is in dispute.

The retirees read the language to mean that PBGC and the administrator may *only agree to appoint a trustee* without proceeding in accordance with the requirements of subsection (c)(1). In other words, the only requirements of subsection (c) that are waived are those that deal with appointment of a trustee. Thus, the retirees' position is that the fourth sentence of subsection (c)(1) only provides an additional method of appointing a trustee after a judicial decree is entered but does not eliminate the requirement for an adjudication.

Alternatively, PBGC interprets the disputed text to say that *if* the parties agree to terminate the plan *and* agree to the appointment of a trustee, *then* without proceeding in accordance with the requirements of the subsection, including the requirement of court adjudication, the trustee shall have the authority described in subsection (d). Put differently, an agreement between PBGC and administrator that a plan should be terminated and to appoint a trustee obviates all other requirements found in subsection (c), including any requirement for an adjudication. Under this interpretation, PBGC and a plan administrator may agree to appoint a trustee to terminate a distressed plan without a judicial decree.

To resolve the dispute, we first look to the plain text of the relevant subsection. The repeated use of the permissive verb "may" in subsection (c)(1)—as opposed to mandatory words like shall[1] or must—indicates that a trustee appointed under subsection (b) is permitted, but not required, to intervene in a proceeding relating to the application for a decree or to initiate a proceeding if one has not been initiated. *See* Scalia & Garner, *supra*, § 11, at p. 112 ("Mandatory words impose a duty; permissive words grant discretion."). Subsection (c)(1) uses no mandatory language that explicitly requires adjudication by a court. As a result, the plain text of subsection (c)(1) permits—but does not require—court adjudication before termination of a distressed pension plan.

Next, we consider relevant canons of statutory interpretation. PBGC argues that the retirees' interpretation violates the canon against surplusage because it renders subsection 1342(b)(3) meaningless. *See* Scalia & Garner, *supra*, at § 26, p. 174. Subsection (b)(3)

---

[1]Of course, depending on usage, "shall" may have several permissible meanings. *See* Scalia & Garner, *supra*, § 11, at pp. 112-15. Still, "when the word *shall* can reasonably be read as mandatory, it ought to be so read." *Id.* at 114.

authorizes PBGC and the plan administrator to appoint a trustee without proceeding with the requirements of subsections (b)(1) or (b)(2). While the retirees' interpretation of subsection (c)(1) does not necessarily render subsection (b)(3) superfluous, it does expose a flaw in their interpretation.

The retirees argue that sentence 4 of subsection (c)(1) is distinct from subsection (b)(3). As the retirees read the statute, sentence 4 of subsection (c)(1) addresses a unique circumstance where the trustee alone has sought to execute termination and PBGC has not sought a decree under sentence 1 of subsection (c)(1). Thus, as the retirees read sentence 4 of subsection (c)(1), it is only operative if the trustee alone seeks termination under sentence 2 of subsection (c)(1) and the court issues a decree to terminate the plan under sentence 3 of subsection (c)(1). If that happens and the conditions of the if-then clause are met, then the trustee has the powers outlined in subsection (d)(1) and is subject to the duties in (d)(3). In other words, the retirees posit that subsection (b)(3) allows PBGC and the administrator to agree on the appointment of a trustee during the period right after the initiation of termination proceedings under subsection (a) but *before a decree for termination is entered*.

The problem with the retirees' argument, however, is that the plain language of sentence 4 is not limited to a situation in which the PBGC and administrator agree to the appointment of a trustee during the period after initiation of termination proceedings but before a decree for termination is entered. Instead, sentence 4 allows the parties to proceed without complying with the requirements in all other sentences of subsection (c)(1) unequivocally. Thus, by its own language, sentence 4 allows the parties to terminate a plan without a court adjudication so long as the parties agree that a plan should be terminated and agree to appointment of a trustee.

Moreover, we consider the statutory language comprehensively and in context. Under the retirees' interpretation, the second condition of the fourth sentence's if-then proposition is that PBGC and administrator must "agree to the appointment of a trustee without proceeding in accordance with the requirements of this subsection." 29 U.S.C. § 1342(c)(1). But that is illogical because subsection (c) only mentions appointment of a trustee once; providing for appointment of a trustee by the court if a trustee was not previously appointed under subsection (b). *See id.* And subsection (b) primarily provides the procedures for appointment of a trustee

under the statute, not subsection (c). Thus, it is unclear how the parties can "agree to the appointment of a trustee without proceeding in accordance with the requirements of [subsection (c)]," when subsection (c) contains no requirements dealing with the appointment of a trustee, except for a passing phrase allowing the court to appoint a trustee if one has not already been appointed under subsection (b).

Lastly, our interpretation is also supported by persuasive authority from other circuits. In *Jones & Laughlin Hourly Pension Plan v. LTV Corporation*, the United States Court of Appeals for the Second Circuit held that "[t]he fourth sentence of subsection 1342(c) provides that where, as here, PBGC and the plan administrator agree to terminate a plan, PBGC need not comply with the other requirements of 'this subsection.'" 824 F.2d 197, 200 (2d Cir. 1987). "Congress, therefore, expressly dispensed with the necessity of a court adjudication in these cases." *Id.* Thus, the Second Circuit has held that Congress expressly dispensed with the necessity of a court adjudication where the PBGC and plan administrator agree to terminate a plan.

The retirees' contention that *Jones & Laughlin* conflicts with a Seventh Circuit decision, *In re UAL Corporation*, 468 F.3d 444 (7th Cir. 2006), is unavailing. The Seventh Circuit stated that "[n]othing in 29 U.S.C. § 1342(c), which describes the judicial function after the PBGC files an action seeking termination, suggests that the court must defer to the agency's view." *Id.* at 450. But *Jones & Laughlin* and *In re UAL Corporation* addressed two distinct legal issues. In *Jones & Laughlin*, the Second Circuit addressed whether subsection 1342(c) authorized termination of a pension plan by agreement between PBGC and the plan administrator. 824 F.2d at 200. In contrast, in *In re UAL Corporation*, the Seventh Circuit considered the appropriate standard of review in a suit where a plan administrator disagrees with the termination and PBGC seeks a court order to terminate a plan. *See* 468 F.3d at 447-50. Thus, to the extent that the Seventh Circuit made pronouncements in *In re UAL Corporation* that support the retirees' interpretation, those pronouncements would constitute dicta because the court did not rest its ultimate judgment on interpretation of 29 U.S.C. § 1342(c). *See Wright v. Spaulding*, 939 F.3d 695, 700-02 (6th Cir. 2019) (discussing principles to determine if a court's discussion constitutes a holding); *see also United States v. Swanson*, 341 F.3d 524, 530 (6th Cir. 2003) (explaining that, generally, dictum is anything "not necessary to the determination of the issue on appeal").

Even so, the retirees also argue that *Jones & Laughlin* is unpersuasive because it utilized outdated notions of statutory interpretation and relied on an obsolete understanding of deference to administrative agencies' statutory interpretations.

First, the retirees' assertion that *Jones & Laughlin* should not be followed because the Second Circuit impermissibly added words to subsection 1342(c) is unconvincing. The *Jones & Laughlin* court did not add any words to the statute when interpreting the relevant provision in subsection 1342(c)(1).[2]

The retirees' second argument—that the *Jones & Laughlin* court impermissibly relied on outdated notions of the deference owed to federal agencies—is more persuasive but still misses the mark. The Second Circuit based its interpretation on "the deference owed to the PBGC as [a] federal agency" and the court's own interpretation of the statutory language. *See* 824 F.2d at 200 n.3. Thus, the Second Circuit's statutory *interpretation* is still entitled to consideration as persuasive authority for this court even if notions of deference to administrative agency interpretations have changed since *Jones & Laughlin* was decided.

Lastly, decisions in several federal circuits, including a published opinion in this circuit, have acknowledged terminations of distressed pension plans by agreement between PBGC and the plan administration pursuant to 29 U.S.C. § 1342(c)(1). *See Pension Benefit Guar. Corp. v. Alloytek, Inc.*, 924 F.2d 620, 624 (6th Cir. 1991) (citing 29 U.S.C. § 1342(c)(1) and acknowledging that "the parties agreed to a consent order which incorporated their agreement and terminated the Plan, established a termination date and provided for the appointment of a trustee"); *see also, e.g., Allied Pilots Ass'n v. Pension Benefit Guar. Corp.*, 334 F.3d 93, 97 (D.C. Cir. 2003) (recognizing that PBGC may seek termination through district court enforcement or voluntary settlement); *In re Syntex Fabrics, Inc. Pension Plan*, 698 F.2d 199, 201 (3d Cir. 1983)

---

[2]After determining that subsection 1342(c) dispensed with the necessity of court adjudication, the *Jones & Laughlin* court said, "The remainder of the fourth sentence of subsection 1342(c) supports this interpretation. It grants to the trustee (PBGC) 'without proceeding in accordance with the requirements of this subsection . . . the power described in subsection (d)(1) of this section and [subjects the trustee] . . . to the duties described in subsection (d)(3).'" 824 F.2d at 200 (citing 29 U.S.C. § 1342) (alterations in original). Thus, the addition with which the retirees take issue appears to have had no effect on the court's interpretation of whether subsection 1342(c) authorizes termination by agreement without court adjudication.

("Despite the so-called involuntary nature of a section 1342 proceeding, PBGC and the plan administrator can still agree to terminate the plan and appoint a trustee without resort to the court."). Of course, these decisions did not directly consider the proper interpretation of subsection 1342(c). Still, they provide strong persuasive authority that several circuits, including our own, have at least recognized a procedure where distressed pension plans may be terminated by agreement under subsection 1342(c) without court adjudication. Moreover, the retirees have not cited, nor are we aware of, any federal authority accepting their proposed interpretation, that termination of a distressed pension plan must be accomplished through court adjudication.

In sum, the most appropriate interpretation of subsection 1342(c)(1) is that it provides two alternative mechanisms for terminating a distressed pension plan. First, the subsection uses permissive language when discussing an in-court adjudication before terminating a pension plan. Second, subsection (c)(1) is not limited to a situation after initiation of termination proceedings under subsection (a) but before a decree for termination is entered. Third, the retirees' interpretation—that if the parties agree that a plan should be terminated they may appoint a trustee without proceeding in accordance with the requirements of subsection (c)(1)—is illogical because the only provision of subsection (c)(1) that deals with the appointment of a trustee is one that allows for appointment of a trustee by the court if one was not appointed pursuant to the requirements of subsection (b). Lastly, the only circuit to directly interpret the statutory language at issue here reached the same conclusion, and the weight of federal authority acknowledges a procedure where PBGC and the plan administrator may terminate a pension plan by agreement without resort to the courts. As a result, we hold that 29 U.S.C. § 1342(c)(1) allows a plan administrator and the PBGC to terminate a distressed pension plan by agreement, without court adjudication.

B.

*Procedural Due Process.* The retirees also claim that their due process rights were violated because they were not afforded a hearing prior to plan termination. We conclude, however, that the retirees do not have a property interest in the full amount of their vested pension benefits because the Salaried Plan document provides that only *funded* benefits at the time of plan termination are nonforfeitable. And, since the retirees do not have a protected

property interest in their remaining unpaid yet vested pension benefits, no due process violation has occurred.

The due process analysis requires two inquiries. *Leary v. Daeschner*, 228 F.3d 729, 741 (6th Cir. 2000). First, we determine whether the retirees have a protected property interest in their vested—but unfunded—pension benefits. *Id.* Second, if they do, then we consider whether PBGC's termination of the Salaried Plan resulted in a deprivation of property without adequate procedural safeguards. *Id.* at 742.

To have a property interest in their vested pension benefits, the retirees "clearly must have more than an abstract need or desire for [them] . . . more than a unilateral expectation of [them] . . . instead, [they] must instead have a legitimate claim of entitlement to [them]." *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Still, "[p]roperty interests . . . are not created by the Constitution." *Id.* "Rather [property interests] are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

Thus, to determine if the retirees have a legitimate claim of entitlement to the entire amount of their vested pension benefits, we must look to the source that creates the purported property interest. Here, the source of the purported property interest is a private contract between the retirees and Delphi. The Salaried Plan document provides that, in the event of plan termination, the "right of all affected employees to benefits accrued to the date of such termination . . . to the extent funded as of such date, is nonforfeitable." In other words, the document provides that *funded* benefits accrued up to the date of plan termination are nonforfeitable.

What about unfunded benefits? The Salaried Plan document contains a provision that provides that benefits that are *funded* at the time of plan termination are nonforfeitable. By necessary implication, unfunded benefits are forfeitable upon plan termination. And so it would seem that retirees have no legal interest in any unfunded yet vested benefits. Binding precedent and ERISA, however, complicate the matter.

ERISA insurance covers "the difference between [an] employee's vested benefits under the terms of the plan . . . and the amount that could be paid from [a] terminated plan's assets." *Nachman Corp. v. Pension Ben. Guar. Corp.*, 446 U.S. 359, 382 (1980). And Supreme Court and Sixth Circuit case law establishes that clauses limiting recovery to funded benefits, like the one here, do not impact ERISA coverage of vested yet unfunded benefits. *Id.* at 372 ("[A] clause limiting an employer's liability does not make otherwise vested benefits forfeitable within the meaning of the Act."); *Matter of Defoe Shipbuilding Co.*, 639 F.2d 311, 312, 314 (6th Cir. 1981) (holding a plan provision providing that "accrued benefits shall be non-forfeitable to the extent funded" was "overridden by the provisions in ERISA identifying the nonforfeitable benefits guaranteed by PBGC," which meant that "the full amount of benefits vested in participants of [the] plan is nonforfeitable"). The upshot is that ERISA insurance covers the unfunded benefits here. But that does not mean that the retirees are statutorily entitled to the full amount of the unfunded benefits. It simply means that they are entitled to PBGC coverage up to the statutory guarantee, which means that retirees have a statutory right to some payment despite lack of funding. *See* 29 U.S.C. § 1322(b)(3). The payment just comes from PBGC rather than from the plan itself. *See id.* § 1322(a).

PBGC does not "dispute that [the retirees'] vested benefits are insured by PBGC"; in fact, "PBGC has been paying those vested benefits up to the guarantee limit for over ten years." And this case is not about the retirees' right to funded benefits. So the only purported property interest that could have been deprived without adequate process is the retirees' interest in the unpaid benefits beyond the ERISA guarantee limit. And the retirees do not have a legitimate entitlement to this remaining balance under ERISA given the guarantee limits or contract law based on the plain language in the Salaried Plan document.

The retirees' arguments to the contrary are unavailing. First, the retirees contend that this court's decision in *Duncan v. Muzyn*, 833 F.3d 567 (6th Cir. 2016), stands for the proposition that "whether a benefit is constitutionally protected" turns on "whether it has vested." In *Duncan*, we addressed whether the Tennessee Valley Authority Retirement System ("TVARS") board violated the Takings Clause when it eliminated cost-of-living adjustments for TVARS-managed pension plans. 833 F.3d at 570. We concluded that while "plaintiffs' claim [was]

framed as a Takings claim, the analysis borrow[ed] principles from the Contract Clause context." *Id.* at 583. Additionally, we recognized that "[w]here a public contract is alleged to have been created by statute, however, a plaintiff may prove a contractual relationship only by showing that the legislature has unmistakably intended to create a binding contract right." *Id.* at 583-84. As a result, we held that the plaintiffs were not deprived of a property right because the COLAs were not vested, and the plaintiffs had failed to show that TVARS unmistakably intended to create a binding contract right. *Id.* at 584.

Contrary to the retirees' assertion, *Duncan* is not controlling here. First, *Duncan* did not explicitly hold that plan beneficiaries always have a property interest in vested pension benefits. *See id.* at 583-84. *Duncan* addressed different legal issues than those raised in this case. And the purported property interest in this case arises from a private contract, not a public contract. *See id.* As such, the retirees' reliance on *Duncan* is misplaced.

Second, the retirees argue that PBGC's interpretation of the Salaried Plan document provision above would violate ERISA's anti-cutback rule. The anti-cutback rule provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441 of this title." 29 U.S.C. § 1054(g)(1). But here, there was a termination of the Salaried Plan, not an amendment. For this reason, it does not appear that the Salaried Plan document provision, which deals only with termination, violates the anti-cutback rule.

Third, the retirees contend that "whether the Retirees have a protected property interest in the full measure of their vested pension benefits cannot turn on the assumed legality of the challenged action (here, the Plan's termination)." But that argument conflates two distinct issues. The retirees contend that the termination of the plan by agreement between the PBGC and plan administrator was illegal because it did not comport with the requirements of 29 U.S.C. § 1342(c). Of course, if the retirees are correct, the action taken by PBGC was illegal and we need not reach the question of whether the retirees have a property interest in the entirety of their vested benefits.

But, if the plan termination by agreement was legal, the relevant question here asks whether, based on the provision in the Salaried Plan document, the retirees have a legitimate claim of entitlement to the entire amount of their vested benefits, no matter how the plan was terminated. The answer to that question is no because the retirees only have a legitimate claim of entitlement to the *funded* benefits pursuant to the Salaried Plan document and ERISA coverage up to the statutory guarantee. Thus, the second question, whether the retirees have a property interest in the entire amount of their vested pension benefits is considered only if the first question, whether PBGC legally terminated the Salaried Plan, is answered in the affirmative.

In sum, neither ERISA nor the Salaried Plan document create a legitimate claim of entitlement to the entire amount of their vested, but unfunded, pension benefits. And because the retirees do not have a legal entitlement to the unpaid balance, their procedural due process claim fails.

## C.

*Arbitrary and Capricious*. The retirees have not demonstrated that PBGC's decision to terminate the Salaried Plan was arbitrary and capricious. The retirees cite evidence to support their position that the plan was not sufficiently underfunded, that GM was willing to consider assuming the Salaried Plan, and that PBGC failed to push back against the Auto Taskforce. Still, there is sufficient countervailing evidence to support PBGC's decision to terminate the Salaried Plan under the criteria found in 29 U.S.C. § 1342(a).

PBGC's final determination is entitled to deference and "will be upheld unless it is shown to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Pension Benefit Guar. Corp. v. Ky. Bancshares, Inc.*, 597 F. App'x 841, 842-43 (6th Cir. 2015) (quoting 5 U.S.C. § 706(2)(A) and citing *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990)). PBGC's decision will be upheld unless we find that the decision:

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). As a reviewing court, we are not at liberty to substitute our judgment for the judgment of the agency. *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43.

> Congress authorized PBGC to initiate termination proceedings when it determines that:

> (1) the plan has not met the minimum funding standard required under section 412 of Title 26, or has been notified by the Secretary of the Treasury that a notice of deficiency under section 6212 of Title 26 has been mailed with respect to the tax imposed under section 4971(a) of Title 26, (2) the plan will be unable to pay benefits when due, (3) the reportable event described in section 1343(c)(7) of this title has occurred, or (4) the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated.

29 U.S.C. § 1342(a). And ERISA states three objectives that PBGC must carry out:

> (1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants, (2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which this subchapter applies, and (3) to maintain premiums established by the corporation under section 1306 of this title at the lowest level consistent with carrying out its obligations under this subchapter.

*Id.* § 1302(a).

The retirees advance several arguments in support of their contention that PBGC's decision to terminate the Salaried Plan was arbitrary and capricious.

First, the retirees contend that GM was willing to consider reassuming the Salaried Plan during its negotiations with the government. And, they argue that PBGC believed that assumption of the Salaried Plan by GM was a viable option until PBGC folded under pressure by the Treasury Department.

But, even when viewing the evidence in the light most favorable to the retirees and drawing all reasonable inferences in their favor, there is ample countervailing evidence to demonstrate that GM was unwilling to assume the Salaried Plan's liabilities. Even if GM was *willing to consider* assuming the Salaried Plan, and even if PBGC was initially in favor of GM's

assumption of the plan, GM never demonstrated an *affirmative willingness* to assume the Salaried Plan.  No doubt, GM considered assuming the Salaried Plan as part of the broader negotiations between GM and the government.  And PBGC initially listed assumption of the Salaried Plan by GM as an alternative to plan termination.  But the retirees acknowledge that GM refused to assume the Salaried Plan and there is no evidence demonstrating that GM's assumption of the plan was a viable alternative to termination.  Thus, PBGC's action cannot be found to be arbitrary and capricious based on its failure to convince GM to assume the Salaried Plan when GM never expressed more than willingness to consider accepting the plan's liabilities.

Moreover, the retirees' main contention seems to be that PBGC should have exerted more pressure on the Treasury Department to ensure that GM would assume the Salaried Plan.  But that argument is flawed for several reasons.

First, the retirees' main grievance on this point seems to be with Treasury's decision not to bail out the Salaried Plan.  And, as PBGC notes, the district court dismissed the claims against the Treasury defendants early in the litigation and the retirees chose not to appeal that dismissal.  Still, on this point, it appears that the retirees' main complaint is that Treasury should have bailed out the Salaried Plan, not that PBGC's decision to terminate that plan was arbitrary and capricious.  Ultimately, PBGC's action cannot be found to be arbitrary and capricious because of a failure of the Treasury Department.

Second, PBGC's decision making process cannot be viewed in a vacuum.  The retirees argue that PBGC's failure to exert pressure on Treasury indicates that the decision to terminate that Salaried Plan was arbitrary and capricious.  But there were many competing interests that PBGC had to weigh in deciding to terminate the Salaried Plan.  Plus, that decision was made in the context of the government's urgent attempt to save GM and the automotive industry.  PBGC was forced to consider other Delphi pension plans, including the Hourly Plan, which was assumed by GM.  Additionally, PBGC had to consider that a delayed termination decision might affect the GM negotiations and could endanger PBGC's ability to recover funds from statutory liens that had been put into place.  Even if PBGC failed to exert pressure on Treasury to bailout the Salaried Plan, that cannot make their decision to terminate the Salaried Plan arbitrary and capricious under the circumstances.

Third, there was sufficient evidence to justify termination of the Salaried Plan. The retirees contend that evidence demonstrated the Salaried Plan's funding level was 85.62%. But, even if that was true, PBGC points out that percentage of underfunding is not a factor to be considered under 29 U.S.C. § 1342(a). Plus, countervailing evidence demonstrates that the Salaried Plan was severely underfunded. For instance, the record indicates that the Salaried Plan was only funded 46.1% on a termination basis. And, even if the Salaried Plan was not underfunded, it is undisputed that Delphi had missed minimum funding contributions, which justified plan termination under § 1342(a)(1). As a result, section 1342(a)'s criteria for termination were satisfied, justifying PBGC's decision to terminate the Salaried Plan.

Lastly, the retirees note that between 2005 and 2009, PBGC worked with thirteen auto-parts suppliers that emerged from bankruptcy without terminating the pension plans sponsored by those companies. They say that lends support to their arbitrary and capricious theory. Not so. First, the evidence demonstrates that PBGC explored alternatives to plan termination and participated in Delphi's bankruptcy negotiations for years before making its final decision to terminate the Salaried Plan. Second, the fact that PBGC negotiated with other companies to save their pension plans from termination is not evidence that the decision it made in this instance was arbitrary and capricious.

At bottom, it is inappropriate for this court to play armchair administrative agency with the benefit of hindsight. Even if we would have reached a different conclusion in the first instance, PBGC's decision to terminate the Salaried Plan was supported by sufficient evidence. Therefore, we hold that PBGC's action was not arbitrary and capricious.

IV.

In sum, the retirees have not raised any argument warranting reversal. First, 29 U.S.C. § 1342(c)(1) provides two mechanisms for termination of a distressed pension plan—including termination by agreement between a plan administrator and the PBGC. Second, the retirees do not have a property interest in remaining unpaid yet vested benefits. Third, PBGC's decision to terminate the Salaried Plan was not arbitrary and capricious because there is ample evidence to support PBGC's decision. As a result, the district court's judgment is AFFIRMED.